594 So.2d 756 (1991)
Margaret M. ROGERS, As Personal Representative of the Estate of Russel B. Rogers, Deceased, Appellant,
v.
Javier RUIZ, M.D., Thoracic and Cardiovascular Associates, Javier Ruiz, M.D., P.A. and Morton F. Plant Hospital Association, Inc., Appellees.
No. 90-01490.
District Court of Appeal of Florida, Second District.
December 13, 1991.
As Amended on Denial of Rehearing February 27, 1992.
*757 Joel D. Eaton, Podhurst, Orseck, Josefsberg, Eaton, Meadow, Olin & Perwin, P.A., Miami and Masterson, Rogers, Patterson, Masterson, O'Brien & Lopez, P.A., St. Petersburg, for appellant.
Ted R. Manry, III and Stephen H. Sears, Macfarlane, Ferguson, Allison & Kelly, Tampa, for appellees Javier Ruiz, M.D. and Thoracic and Cardiovascular Associates, Javier Ruiz, M.D., P.A.
James A. Martin, Jr. and Margot Pequignot, McMullen, Everett, Logan, Marquardt & Cline, P.A., Clearwater, for appellee Morton F. Plant Hosp. Ass'n, Inc.
LEHAN, Judge.
This is a medical malpractice suit against a physician, the physician's professional association, and a hospital brought by a wife, as personal representative of her husband's estate, for the death of her husband. The suit alleges that the death resulted from negligently performed surgery. We reverse the summary judgment for defendants which was entered by the trial court on the basis that the two-year statute of limitations under section 95.11(4)(b), Florida Statutes (1985), had expired.
*758 We conclude, consistent with the trial court's ruling, that the running of the statutory period had been triggered at the time plaintiff was informed of her husband's death from the surgery by defendant physician at defendant hospital, which was more than two years prior to the service of the presuit notice. However, we also conclude that the summary judgment should have been precluded by fact questions to be decided by a jury as to whether the running of the statutory period had been tolled by fraudulent concealment by defendants so that the period had not expired at the time of the service of the presuit notice.
In explaining these conclusions we will: (I) outline the procedural background and alleged facts; (II) give our basic reasons why the statutory period was triggered at the time plaintiff was informed of her husband's death from the surgery by the physician at the hospital, which is our majority view from which one judge dissents; and (III) give our reasons why there are questions of fact as to whether fraudulent concealment tolled the running of the statutory period, which is our unanimous view. Our holding and the fundamental rationale therefor will be fully contained in those sections (I), (II), and (III). We will then in section (IV) give in some detail further reasons for the majority view of section (II) and why the view of the partially dissenting opinion in this case is not considered to reflect controlling case law.

I. Procedural Background and Alleged Facts

The rather extensive recitation of evidence in this section of our opinion, which gives to a large extent plaintiff's side of the case, is of course not to be taken as reflecting this court's view of the merits. It is provided to show when the statute of limitations was triggered under the uncontroverted facts and why we have concluded that plaintiff has presented evidence concerning fraudulent concealment which, as indicated above, creates fact questions to be resolved at trial by a jury and not by a court as a matter of law, as was the result below. In any event, this recitation is taken to a substantial extent from the Statement of Facts in plaintiff's brief which defendant physician's brief states it "will generally accept" and which defendant hospital's brief does not show to be erroneous for present summary judgment purposes. At the same time the briefs of the physician and the hospital vigorously take issue with plaintiff's interpretation of the evidence in applying pertinent principles of law.
The procedural background may be summarized as follows. The complaint of plaintiff Margaret M. Rogers, as personal representative, alleges that on May 28, 1985, her husband, Russel B. Rogers, underwent quadruple aortocoronary bypass surgery while a patient at defendant Morton Plant Hospital; that the surgery was performed by defendant Dr. Javier Ruiz; and that plaintiff's husband died as a result of the surgery. The complaint shows that the requisite presuit notice had been served upon defendants on October 11, 1988, more than two years (and less than four years) after the date of Mr. Rogers' death. Suit was filed on January 24, 1989 upon expiration of the ninety-day waiting period.
The complaint contains three counts. Count I asserts negligence claims against the hospital and Dr. Ruiz. Count II asserts claims for punitive damages against the hospital and Dr. Ruiz for the conduct alleged in Count I, which is characterized as "willful and wanton." Count III asserts a claim against Dr. Ruiz for failing to obtain a proper informed consent.
Both defendants answered, generally denying liability and alleging affirmatively that the claims against them were barred by the statute of limitations. Following extensive discovery, both defendants moved for summary judgment based upon their statute of limitations defenses. These motions were ultimately granted and final judgments were entered in favor of defendants. Plaintiff's motion for rehearing was denied and this timely appeal followed.
The record contains evidence indicating the following facts. In 1975, ten years before Mr. Rogers' surgery, the hospital *759 began a cardiac surgery program. At that time, Dr. Ruiz was the only cardiac surgeon granted staff privileges. He was not board certified. As early as 1977, the hospital's president, Duane Houtz, was advised that Dr. Ruiz' surgery mortality experience was not acceptable, but Mr. Houtz discounted that advice. In 1980, the hospital amended its bylaws to require board certification as a condition to staff privileges. Dr. Ruiz was not board certified and he was "grandfathered in."
At a meeting held in the summer of 1983 at which the hospital's president and its director of medical affairs were in attendance, a study was presented which demonstrated that Dr. Ruiz' mortality rate of 11 1/2% for the years 1980-1983 was twice as high as that of another cardiac surgeon operating at the hospital. As a result of that study a biostatistician was hired to do an analysis of the data gathered concerning the mortality rates of Dr. Ruiz and the other surgeon. On August 25, 1983, the biostatistician reported preliminarily to the hospital's director of medical affairs, Dr. Norman Tarr, that most hospitals experienced a mortality rate of less than 5% for aortocoronary bypass surgery; that a rate in excess of 10% should be considered unacceptable for any institution; that Dr. Ruiz' mortality rate was significantly greater than that of the other surgeon; and that there was sufficient cause for concern to justify a more extensive study.
Sometime during 1984, several operating room nurses at the hospital complained to another cardiac surgeon, Dr. Richard Murbach, that "Dr. Ruiz' surgical technique was not up to par"; that bleeding of patients at operations conducted by him was "excessive"; and that his judgment was "questionable." Dr. Murbach voiced these concerns to Dr. Tarr. Shortly thereafter, the more extensive study recommended by the biostatistician was commissioned. The biostatistician then studied 1,888 heart surgeries performed by ten different surgeons at the hospital between 1975 and 1983 and concluded that the risk of operative mortality was "significantly greater" for Dr. Ruiz than for any other surgeon; that Dr. Ruiz' mortality rate for aortocoronary bypass surgery was more than double that of the risk observed for other surgeons; and that Dr. Ruiz' "adjusted mortality rate" for the nine-year period was 16.8%. The biostatistician's written report containing those conclusions was submitted to Dr. Tarr in September 1984. Although Dr. Tarr wanted to send the biostatistician's study to the American Thoracic Society for further analysis and independent review, that was not done because Dr. Ruiz refused to sign a waiver for that purpose. As a result and to prevent the study from becoming public, the study was not used for any purpose and was locked up in Dr. Tarr's office.
While the study was being conducted, Dr. Ruiz' mortality rate increased to 18% during 1984. In October 1984, Dr. Murbach complained once again to Dr. Tarr and was told that "appropriate steps were being taken." Various operating room personnel also decided in late 1984 and early 1985 that they no longer wanted to work with Dr. Ruiz; those concerns were voiced to their superiors. The concerns were also relayed to Dr. Tarr. The operating room personnel continued to work with Dr. Ruiz, however, because they were told to do so. In April 1985, the nurse who was the operating room supervisor put into the form of a memorandum her team's displeasure with Dr. Ruiz. The memorandum was addressed to her superior and later delivered to Dr. Tarr. Dr. Tarr took no action concerning the memorandum because it was, in his words, "not specific enough." By the middle of June, 1985, Dr. Ruiz' mortality rate had increased to 37%.
Dr. Ruiz and the deceased, Russel B. Rogers, first became acquainted with one another through business dealings. Mr. Rogers was in the real estate business. As time passed, Mr. Rogers and Dr. Ruiz became personal friends. In 1985, Mr. Rogers went to Dr. Ruiz for a stress test. Dr. Ruiz informed Mr. Rogers that he needed bypass surgery, and he represented to Mr. and Mrs. Rogers that the normal risk of death from the surgery was 4%. No one at the hospital, to which Mr. Rogers was admitted as a patient, told Mr. Rogers otherwise. *760 Mr. Rogers consented to the surgery which was performed on May 28, 1985.
Plaintiff testified that Mr. Rogers was in good condition at the time he went to see Dr. Ruiz. She also testified that she thought the chances for successful surgery (96%) were good, and that she never thought her husband might not survive.
Assisting Dr. Ruiz during the surgery was an experienced registered nurse, Ms. Lauren Burch, who had participated in half of all the cardiac surgeries done at the hospital since 1975. Ms. Burch was one of the nurses who had expressed her desire not to work further with Dr. Ruiz, but she scrubbed for Mr. Rogers' surgery because she had been told to do so. Ms. Burch wrote a memorandum three days after Mr. Rogers' death explaining what happened during the surgery. The memorandum states as follows:
To Whom It May Concern,
On Tuesday, May 25 [sic], 1985, I was the first scrub nurse on the open heart surgery for Mr. Russel Rogers, patient of Dr. Ruiz.
Immediately following the case, I requested a conference with Ms. Wilmarth [director of surgical services] & Ms. Young [O.R. manager] to share my observations. Within the hour I spoke also with Dr. Tarr.
As an open heart nurse with 10 years of experience, it is my observation that the internal mammary dissection done by Dr. Ruiz on this case was done without due reguard [sic] to the delicacy of this vessel. There was no protective pedicle taken around the vessel, the vessel was pulled on and compressed numerous times with a large vascular forcep [sic], an excessively large number 8 hemoclips was used and I did not, at any time, see any blood flow through the IMA before it was sutured into the coronary artery. When I questioned Dr. Ruiz as to the blood flow through the IMA he told me that medication could be given to the patient later to improve the flow. We closed the incision although the patient did not appear to be doing well.
As we were preparing to move the patient to the ICU bed his condition began to worsen dramatically. Dr. Ruiz came back into Room 4 singing and dancing with his mask off and came toward me and my sterile tables. I asked him to please put his mask back on and not to touch me or the tables. I observed the patient's condition as becoming worse. I quickly rearranged the instruments and prepared to re-open [sic] the chest immediately. Dr. Ruiz at that time made the decision to attempt percutaneous insertion of the intra-aortic baloon [sic] device. He had great difficulty inserting the IABP, we finally convinced him to try a cutdown. In my opinion a great deal of time was spent with the IABP that should have been spent opening the chest  internal cardiac massage was necessary. In my experience I have never seen a surgeon attempt to insert the IABP by the percutaneous method into a previously grafted femoral artery.
Finally, Dr. Kottmeier insisted that the chest be opened as we were losing the patient. Dr. Ruiz began cardiac massage (not as vigorous as I have seen all other surgeons perform this method). He stopped the internal massage to put in cannulation pursestrings. I suggested continuation of cardiac massage until the pump lines were ready and then inserting the cannulas first and sutures later. I have seen this method used upon several occasions in order to maintain adequate cardiac output until the pump and pump lines were ready. He did not do so.
Once we were back on bypass, it appeared to me that the IMA was completely flacid [sic] with no apparent blood flow through the vessel. At that time another vein graft was taken from the leg and sutured to the [vessel that the internal mammary artery was already sutured into].[1]

*761 The patient's condition became worse. Dr. Ruiz asked his nurse to go tell the family that he did not expect the patient to survive. The patient was still on bypass at that time. At that time I turned the case over to the other scrub nurse and came out to speak with Ms. Young and Ms. Wilmarth.
At the time she wrote this memorandum, Ms. Burch was "much offended" by what she had seen and felt that Mr. Rogers' death was Dr. Ruiz' fault.
Dr. Charles Kottmeier, the anesthesiologist for the surgery, testified that Mr. Rogers was fairly healthy at the time of the surgery; that Dr. Kottmeier agreed with the description in Ms. Burch's memorandum of Dr. Ruiz' surgery; and that the manner in which Dr. Ruiz had performed the surgery fell below acceptable standards of care. None of the doctors, nurses or hospital staff informed Mrs. Rogers of their feeling that Mr. Rogers died as a result of negligence.
Dr. Ruiz told plaintiff and her three children that everything had gone well during the surgery, that everyone did all they could, that the death was unexplainable, and that "God had simply taken Mr. Rogers." The discharge summary and procedure report in Mr. Rogers' hospital chart reflects the cause of his death as "left ventricular failure."
Ms. Burch's memorandum was not placed in Mr. Rogers' hospital chart. Ms. Burch testified that she was told by one of her superiors that no one would ever see the memorandum. Plaintiff's expert, Dr. Roe, testified that the information recited in Mr. Rogers' hospital chart (including a subsequent autopsy report) does not reveal a deviation from accepted standards of care, that such information demonstrates only "that the patient's death was circumstantial and beyond the control of those taking care of him."
On the day that Dr. Tarr received Ms. Burch's memorandum and after he had discussed the matter with the president of the hospital, Dr. Tarr met with Dr. Ruiz and, while not specifically advising him of the memorandum, substantially advised him of the matters contained in the memorandum. Dr. Tarr suggested that Dr. Ruiz voluntarily cease doing cardiac surgery. Dr. Ruiz said he was not willing to do that. Dr. Tarr then appointed a committee of four physicians to look into the matter. Several days later the committee reported unfavorably on Dr. Ruiz' recent mortality experience. On June 18, the president of the hospital asked Dr. Ruiz voluntarily to suspend his cardiac surgery privileges. When Dr. Ruiz refused, he was handed a letter summarily suspending his cardiac surgery privileges, effective June 19, 1985.
Several weeks after the surgery on Mr. Rogers, plaintiff and her three children met with Dr. Ruiz to go over the autopsy report. Dr. Ruiz gave them a "technical explanation" of the autopsy and told them that the surgery had gone well; that he did not know what had happened; that it was just one of those things; that Mr. Rogers' death was merely one of those unexplainable deaths which results from this type of surgery; that Mr. Rogers' heart was old and tired and simply gave up; and that Mr. Rogers' time had come.
Shortly thereafter, plaintiff's 38-year-old son, Dan Rogers, was told by his wife (a nurse in another hospital) that she had heard a rumor concerning Dr. Ruiz' suspension. The rumor was discussed among all the children. They decided that the rumor should be confirmed before disclosing it to plaintiff because it would unnecessarily upset her if she were told about it and it turned out to be untrue. Dan Rogers undertook to investigate the rumor. He met with Leonard Gorman, the risk manager for the hospital. Dan Rogers advised Mr. Gorman that he had heard a rumor that Dr. Ruiz had been suspended and that the suspension may have been related to Dan's father's surgery. Mr. Gorman said he did not know anything about that and told Dan Rogers he would explore it and contact him at a later date.
Mr. Gorman confirmed the foregoing in his deposition. He testified that after that meeting with Dan Rogers he, Mr. Gorman, was advised by Mr. Houtz to speak with an attorney, Edwin Mortell of Palm Beach, *762 who was not the attorney with whom Mr. Gorman usually dealt in hospital matters. According to Mr. Gorman, Mr. Houtz informed Mr. Gorman that he was to talk to Mr. Mortell because there was a conflict of interest with the law firm the hospital normally used since that firm also represented Dr. Ruiz. Mr. Gorman testified that attorney Mortell then "coached me as to what I could say when I called Dan Rogers back as to the status of Dr. Ruiz." Mr. Gorman wrote down what he was told to say.
On July 1, 1985, the president of the hospital wrote Dr. Ruiz a letter notifying him of the date of the hearing which Dr. Ruiz had requested to contest the suspension of his privileges. The letter stated that Dr. Ruiz' cardiac privileges had been summarily suspended because "your cardiac surgery mortality rate for the period from January 1, 1984 through June 8, 1985, is at an unacceptably high level," and "of your cardiac surgery mortalities for that period, six (6) of the deaths were potentially preventable." One of the six "potentially preventable" cases identified in the letter was "Chart No. 100824," which was Russel B. Rogers' chart.
On that same date, July 1, 1985, Mr. Gorman telephoned Dan Rogers. At the time he made the call, Mr. Gorman knew that Dr. Ruiz' cardiac surgery privileges had been suspended. Dan Rogers testified that he received a telephone call from Mr. Gorman who advised him that Dr. Ruiz had not been suspended and that he was not aware where such a rumor may have come from. Mr. Gorman indicated that an investigation was ongoing, that during the investigation Dr. Ruiz' privileges had been curtailed, that the details of any such investigation were confidential, but that Dr. Ruiz had done some very important surgeries in the hospital recently.
Dan Rogers asked Mr. Gorman to notify him if the investigation brought to light any factors relating to the death of Dan's father and testified that he never heard from Mr. Gorman again. Dan Rogers further testified that from the conversation with Mr. Gorman it was his impression that when a death takes place at the hospital there is an investigation, that some surgeries cannot be performed while the investigation takes place, and that such an investigation is usually a mere formality which is kept confidential. Dan Rogers testified that based upon his conversation with Mr. Gorman he no longer had any concern or suspicion that Dr. Ruiz had been suspended or that any such suspension may have been the result of any wrongdoing in the course of the surgery on Dan's father. Dan Rogers continued to have confidence in Dr. Ruiz and to believe that his father's death was unexplainable. In April 1987, Dan Rogers still had every confidence in Dr. Ruiz and felt he had no reason for concern about the circumstances of his father's death. He then drove from his home in Orlando to Clearwater for the purpose of having a cardiac evaluation performed on him by Dr. Ruiz.
On July 9, 1985, Mr. Gorman wrote a memorandum to the hospital's president describing his telephone conversation with Dan Rogers. The memorandum in effect confirms the essential points of Dan Rogers' recollection of the conversation. Dan Rogers discussed the conversation with his brother and sister and, because Mr. Gorman had denied the rumor, they decided they would spare their mother unnecessary distress and would not tell her about it.
At this point in time plaintiff had no suspicion that anything untoward had happened in connection with her husband's surgery. She had accepted Dr. Ruiz' explanation for her husband's death. She also had no such suspicions when she went to Dr. John Christ for a physical examination in November 1985. Dr. Christ had consulted with Dr. Ruiz in May 1985 and had cleared Mr. Rogers for the surgery, noting in his consultation report that the "time is ideal for surgery." During her physical exam, Dr. Christ told plaintiff how sorry he was to hear that Mr. Rogers had passed away and commented that "I would have liked to have tried medication on him."
Plaintiff testified that she understood this comment of Dr. Christ to have been "indirectly critical" of Dr. Ruiz. She conceded that "it ate at me" but said she took *763 the comment to mean only that Dr. Christ would have liked to have tried medication as an alternative to bypass surgery, not as a criticism of the manner in which the surgery had been performed. When she discussed the comment with her children, she attributed that meaning to the comment, saying that Dr. Christ had said, "He felt he would have tried medication instead of surgery."
Dr. Ruiz ultimately sued six of his competitors for conspiracy to ruin his reputation and to monopolize the open heart surgery practice in Clearwater. He also sued the hospital. Because the information regarding Dr. Ruiz' mortality rates was a defense to Dr. Ruiz' lawsuits, that information came out in detail in March 1988 during the trial of one of the lawsuits brought by Dr. Ruiz. The information was also contained in newspaper articles at the time, which included articles specifically identifying Dr. Ruiz' unsuccessful surgery upon Mr. Rogers. According to plaintiff and her children, this was the first time that they had any notion of any potential malpractice claim against Dr. Ruiz or the hospital. Plaintiff and her children then retained an attorney, an investigation was conducted, and the presuit notice letters were served approximately six months later on October 11, 1988.

II. The Statute of Limitations Was Triggered at the Time Plaintiff Was Informed of Her Husband's Death From the Surgery by the Physician at the Hospital

Our determination that the statute of limitations was triggered at the time plaintiff was informed of her husband's death from the surgery by the physician at the hospital, which was more than two years prior to the service of the presuit notice, has as precedent squarely in point the majority opinion in Goodlet v. Steckler, 586 So.2d 74 (Fla. 2d DCA 1991). That determination is also supported by the concurring opinions in Goodlet, id. at 76, and in Jackson v. Georgopolous, 552 So.2d 215, 216 (Fla. 2d DCA 1989). This case is the same kind of case concerning the type of notice to plaintiff which triggers the medical malpractice statute of limitations as was Goodlet in which the statute was found to have run. In both this case and in Goodlet the plaintiff had notice not simply of the injury (for present purposes, the death) but also of the injury having resulted from treatment by defendant physician. Of course, plaintiff in this case also had notice that the treatment took place at defendant hospital.
Those concurring opinions in Goodlet and Jackson explain specifically why it was concluded that the statute was triggered in those cases and in doing so set out a test as to when the statute may be triggered in the absence of notice of negligence. As those opinions say in that regard, the medical malpractice statute of limitations may be triggered by notice of "the injury and of the incident involving defendant resulting in the injury." 586 So.2d at 76; 552 So.2d at 218.
The Goodlet majority opinion declined to say specifically whether only notice of injury is enough to trigger the statute or whether, as is essentially required by the foregoing test stated in the Goodlet and Jackson concurring opinions, notice of defendant's involvement with the injury is additionally necessary, saying that, in any event, both were present in that case. Applying that test to the uncontroverted facts of this case, we conclude that the statute was triggered at the time plaintiff was informed of her husband's death because at that time she had notice not only of the injury (the death) but also of the incident (the operation) involving defendants resulting in the injury.
That test was set out to follow, as of course we must, controlling supreme court case law establishing the parameters of the types of notice which trigger the medical malpractice statute of limitations. That case law establishes that the statute is triggered when there has been relatively strong notice of the circumstances, i.e., notice of negligence, or, if there has been no notice of negligence, when there has been notice only of "the injury." See, e.g., University of Miami v. Bogorff, 583 So.2d 1000, *764 1002 (Fla. 1991) ("[T]he limitation period commences when the plaintiff should have known of either (1) the injury or (2) the negligent act."[2]). Thus, whether or not one may feel that a plaintiff's medical malpractice suit should not be barred by the statute by reason of the plaintiff, who had no notice of negligence, having received only the relatively slight notice of the injury more than two years prior to the service of the presuit notice, we are bound by the foregoing parameters established by the supreme court.
Nonetheless, as concluded in those concurring opinions, the parameter of notice of only injury should not be construed to mean literally what it says, in which case a plaintiff would be barred from suit without there necessarily being any evidence that plaintiff had any notice of even the person or of any of the circumstances which caused the injury. Therefore, as the Jackson concurring opinion explained was consistent with the case law, and as Bogorff thereafter effectively confirmed as explained in the Goodlet concurring opinion, as will be pointed out below, notice of injury in this context should be construed to include necessarily at least notice of "the incident involving defendant resulting in the injury."[3] Again, a plaintiff cannot be let off the statute of limitations hook on the basis simply that the statute was not triggered because plaintiff did not have notice of defendant's negligence, as may be concluded that Judge Ryder's partially dissenting opinion in this case in effect would do.
As pointed out above, there was in this case sufficient notice to trigger the statute of limitations under the holding of the majority opinion in Goodlet as well as under the test set out in the concurring opinions in Goodlet and Jackson. In fact, there was in this case much more such notice than there was in Goodlet because here, in contrast to Goodlet, plaintiff had specific notification of the fact and nature of the operation at defendant hospital by defendant physician on decedent resulting in the death. In Goodlet there had been only the notification of the limited facts that plaintiff's daughter had died and that defendant had been the daughter's treating physician. As the majority opinion in Goodlet points out, the requisite notice to trigger the statute need only be "notice that a timely investigation should begin in order to discover any additional facts needed to support a medical negligence action." 586 So.2d at 75 (emphasis in original).
In Jackson there was even more notice of the circumstances than in this case and in Goodlet, but of course the fact that there was more notice in Jackson does not mean that there was not sufficient notice in this case.
Bogorff, as we have said, effectively confirmed the view expressed in the Jackson and Goodlet concurring opinions that the medical malpractice statute of limitations may be triggered, in the absence of notice to plaintiff of negligence, by notice to plaintiff of "the injury and of the incident involving defendant resulting in the injury." *765 The reasoning of Bogorff reflects that view. As the concurring opinion in Goodlet explains in that regard,
The facts of this case are similar in material respects to those in Bogorff, which held that in that case there had been sufficient notice to trigger the medical malpractice statute of limitations. The reason in Bogorff may be equated to my reason in this case by substituting in the following quotation from Bogorff [which gave the rationale of that case for the decision that the statute of limitations had been triggered and had run] the concept of notice for that of knowledge and the word "daughter" for "son":
Although [plaintiffs] did not know if medical negligence caused [their son's] condition, they knew that [defendant doctor] had treated [the son] and knew of his injury.
583 So.2d at 1002. While in Bogorff the supreme court had, as it had done in prior opinions, referred to the medical malpractice statute of limitations as being triggered by only notice of "the injury," the above quoted language from the opinion in that case in effect explains, I conclude, that there was what was called notice of injury which triggered the statute because there was notice of the injury and of the incident involving defendant resulting in the injury.
586 So.2d at 76-77.

III. There Are Questions of Fact as to Whether Fraudulent Concealment Tolled the Running of the Statutory Period

Even though, as explained above, the statute of limitations began to run at the time plaintiff was informed of her husband's death from the surgery by defendant physician at defendant hospital, in our unanimous view it cannot be concluded as a matter of law that the two-year statutory period had expired prior to plaintiff's service of the presuit notice. Fraudulent concealment of circumstances which would (a) put a plaintiff on the type of notice requisite to trigger the statute, as discussed above, or (b) prevent plaintiff's investigation from, in the words of the Goodlet majority opinion, "discover[ing] any additional facts needed to support a medical negligence action," 586 So.2d at 75, tolls the running of the statute. See Bogorff, 583 So.2d at 1002-03. See also Nardone v. Reynolds, 333 So.2d 25, 37, 39 (Fla. 1976); Phillips v. Mease Hospital & Clinic, 445 So.2d 1058, 1061 (Fla. 2d DCA 1984); Alford v. Summerlin, 362 So.2d 103 (Fla. 1st DCA 1978).
As the Florida Supreme Court stated in Bogorff regarding whether under particular circumstances a physician's expressed view that his treatment of a patient had not caused the patient's injuries may constitute fraudulent concealment,
A jury ... may have determined that [the physician's] views were not an honest difference of opinion, but were taken to detract from [plaintiff's] concerns that there was a causal connection between his treatment and [the injury]. An attending physician has a strong duty to fully address the concerns of patients and to be fully candid with them. If a doctor's communication to a patient was intended to cause that patient to abandon a claim or investigation, it may amount to fraudulent concealment.
583 So.2d at 1003. The import of that statement encompasses the communications of a treating physician and of a representative of the hospital where the treatment was performed to the survivors of a deceased patient.
In our view there are in this case material fact questions created by plaintiff's evidence indicating that the statute of limitations was tolled by fraudulent concealment of the type referred to in (b) above. Those questions preclude the summary judgment which was entered below in favor of defendants.
That evidence includes the evidence described above concerning Dr. Ruiz' representation to plaintiff that the operation went well and the death was unexplainable and simply an act of God. Also included is the evidence described above concerning the failure of the hospital, through Mr. Gorman, to reveal in response to Dan Rogers' *766 inquiry that Dr. Ruiz' privileges had been suspended, and Mr. Gorman's representations to the effect that Mr. Gorman was unaware of any basis for the rumors concerning such a suspension being related to the operation resulting in Mr. Rogers' death. Whether the hospital's communications with plaintiff's son were effectively communications with plaintiff is a factual question for the jury under the circumstances of this case.
Based upon that evidence there is a question of fact as to whether both Dr. Ruiz and the hospital improperly covered up, and prevented plaintiff from knowing of, the negligence with which those defendants are charged.
Summary judgment should be cautiously granted in negligence and malpractice suits. Moore v. Morris, 475 So.2d 666, 668 (Fla. 1985). If the record reflects the existence of any genuine issue of material fact or the possibility of any such issue, or if the record raises even the slightest doubt that such an issue might exist, summary judgment is improper. Crandall v. Southwest Florida Blood Bank, Inc., 581 So.2d 593 (Fla. 2d DCA 1991); Cohen v. Wall, 576 So.2d 945 (Fla. 2d DCA 1991); Gomes v. Stevens, 548 So.2d 1163 (Fla. 2d DCA 1989).

IV. The View of the Partially Dissenting Opinion in This Case Does Not Reflect Controlling Case Law

The remainder of this opinion further explains why we have concluded that the statute of limitations period was triggered at the time plaintiff was informed of her husband's death from the surgery and why we cannot agree with Judge Ryder's partially dissenting opinion which essentially adopts the contrary argument advanced by plaintiff in that regard. This explanation is an additional effort to fulfill a primary appellate court function of clarifying an area of the law which, as indicated by the diverse arguments which have been made to this court recently in these kinds of cases on behalf of both plaintiffs and defendants, has needed clarification. See Scheb, Florida's Courts of Appeal: Intermediate Courts Become Final, 13 Stetson L.Rev. 479 (1984).
Explained below are why: (a) the requirement of "notice of possible negligence" espoused by Judge Ryder's opinion to trigger the statute of limitations absent notice of negligence may be considered either to be not different in a practical sense from the requirement of notice of negligence (which, as his opinion recognizes, is not to be required to trigger the statute under supreme court case law) or, at best, to promote uncertainty in the law; (b) his opinion's criterion that the injury be "completely unexpected" in order that the foregoing requirement of notice of possible negligence be met would even more definitely require notice of negligence to trigger the statute; and (c) most importantly, his opinion would be in conflict with the most recent Florida Supreme Court pronouncement in this area of the law in Bogorff.
(a) The Requirement of "Notice of Possible Negligence" Espoused by the Partially Dissenting Opinion to Trigger the Statute of Limitations Absent Notice of Negligence May be Considered Either to be Not Different in a Practical Sense From the Requirement of Notice of Negligence (Which, as That Opinion Recognizes, is Not to be Required to Trigger the Statute Under Supreme Court Case Law) or, at Best, to Promote Uncertainty in the Law

Judge Ryder's opinion disclaims a requirement of notice of negligence in order to trigger the medical malpractice statute of limitations, recognizing that that would be contrary to controlling precedent and saying that his opinion would require only notice of the "possible involvement of negligence" from an injury which is "out of the ordinary" and "unusual." However, that requirement may be considered effectively to constitute a requirement of notice of negligence. The reason is that the notice concept pertaining to a requirement of notice of a particular phenomenon may be taken inherently to encompass indications to the person involved of only the possibility of that phenomenon as explained below.
*767 "Notice" in this context of course does not mean knowledge and, as Judge Ryder's opinion recognizes, means only what has been termed "constructive notice." Constructive notice is defined as "information or knowledge of a fact imputed by law to a person (although he may not actually have it), because he could have discovered the fact by proper diligence, and his situation was such as to cast upon him the duty of inquiring into it." Black's Law Dictionary 958 (5th ed. 1979). Thus, the requirement of Judge Ryder's opinion of notice of possible negligence may be not necessarily different from a requirement of notice of negligence because constructive notice of negligence received by a person could include notice to that person of no more than the possibility of negligence which would then "cast upon him the duty of inquiring into it" and thereby discovering the actual negligence.
Accordingly, Judge Ryder's opinion can be taken to be in conflict with controlling precedent by meaning in essence that while knowledge of negligence is not necessary to trigger the medical malpractice statute of limitations, notice thereof is required to do so. As indicated above, a requirement of notice of the possibility of negligence may be concluded to be, in a practical sense, no more than a requirement of a lesser burden of showing notice of negligence.
That, as his opinion points out, generally the statute of limitations is triggered by notice of "the possible invasion of one's legal rights" should not mean in the context of a case like this that in the absence of notice of negligence the statute may only be triggered by notice of "possible negligence". We recognize that, in the abstract, notice of "the possible invasion of one's legal rights" may seem the same as notice of possible negligence. But the term "invasion of legal rights," is a broad term used generally with reference to when a statute of limitations is triggered in any case. The term simply refers to the question of "when [plaintiff] has been put on notice of his right of action," the answer to which is determined by the rules laid down in the case law for different types of rights of action. See Nardone v. Reynolds, 333 So.2d 25, 34 (Fla. 1976) (quoting from Vilord v. Jenkins, 226 So.2d 245 (Fla. 2d DCA 1969)). In the context of medical malpractice cases the term has been used by the Florida Supreme Court to refer to situations in which there was notice of injury, in contrast to notice of negligence. As the supreme court said in Bogorff,
[T]he triggering event for the limitation period was the [plaintiffs'] notice of injury to their child; not ... additional notice that [the doctor's] negligence caused the injury... . As a matter of law, the [plaintiffs] were on notice of the possible invasion of their legal rights and the limitation period began running.
583 So.2d at 1002. See also Moore v. Morris, 475 So.2d 666, 669-70 (Fla. 1985); 51 Am.Jur.2d Limitation of Actions § 135 (1970).
And in Goodlet notice of injury, which, as the Goodlet concurring opinion specifically points out, included in that case (as in this case) notice of the treatment by defendant doctor of plaintiff's decedent resulting in the injury, was not notice of either negligence or possible negligence in the sense that it did not provide notification of anything done by defendant below the standard of care. Yet that notice was considered by the holding in that case to have been enough to have triggered the statute by invoking a duty to investigate further (consistent with the foregoing definition of "constructive notice") and thus, in effect, to have constituted notice of the possible invasion of the plaintiff's legal rights.
As pointed out above, we are of course bound by supreme court parameters for the triggering of the statute of limitations and are not free to let a plaintiff off the statute of limitations hook by finding that the statute could only have been triggered by notice of negligence, or notice of possible negligence certainly to the extent that is the same as notice of negligence. It seems that that is what we would be doing if, as does Judge Ryder's opinion, we equated the general requisite of notice of "the possible invasion of legal rights" with notice of possible negligence. In other *768 words, what may broadly constitute in all types of cases notice of "the possible invasion of legal rights" has been defined by the supreme court necessarily to be in medical malpractice cases either, at one end of the scale, notice of negligence, or, at the other end, notice of only injury (including, as specifically concluded in the Jackson and Goodlet concurring opinions and effectively confirmed by Bogorff, notice of the incident involving defendant resulting in the injury).
Applications of elusive notions of possible negligence, as contrasted with negligence, combined with the no less elusive notion of constructive notice can be obscure and debatable. Therefore, the foregoing discussion of those notions in this case is subject to legitimate debate. Be that as it may, of considerable significance which seems undeniable is the point, hopefully shown by that discussion, that a "notice of possible negligence" requirement like that espoused in Judge Ryder's opinion is subject to criticism and, as a legal standard to control this kind of case, may promote even greater uncertainty in the law than has existed.
If, on the other hand, the purpose of Judge Ryder's opinion in espousing the requirement of notice of at least possible negligence is not to require notice of negligence but to mean only that notice of circumstances in which negligence was possible may trigger the statute, that type of notice may be considered to have been already encompassed within, and to be an inherent part of, the above-quoted test stated in the concurring opinions in Jackson and Goodlet which Judge Ryder's opinion rejects. But that does not seem to be the purpose of his opinion, as indicated in the following section IV(b) of this opinion which is to the effect that by requiring that in order for there to be notice of "possible negligence" the injury must be a "completely unexpected" result, Judge Ryder's opinion requires notice of negligence.
Perspective may be provided by considering that over the broad spectrum of different notice concepts which have been dealt with in the case law pertaining to what may be sufficient to trigger the medical malpractice statute of limitations in the absence of notice or knowledge of negligence there have been: (1) notice of only injury (which both of the opinions in Goodlet and the concurring opinion in Jackson recognize as being literally sufficient to trigger the statute under statements in Florida Supreme Court case law but which all those opinions, as well as Judge Ryder's opinion in this case, do not conclude was established by the Florida Supreme Court to be sufficient by itself); (2) notice of "the injury and of the incident involving defendant resulting in the injury," the test contained in the concurring opinions in Goodlet and Jackson which has been applied in this case; (3) notice of the possibility of negligence, the test espoused in Judge Ryder's opinion in this case; and (4) no less than notice of negligence. Concept (1) obviously would favor defendants. Concept (4) obviously would favor plaintiffs. Concept (2) is more of a middle ground which the Florida Supreme Court appears to have intended, which, as explained in the concurring opinion in Jackson, is consistent with all, or virtually all, the case law, and which, as explained above, was effectively confirmed by the supreme court in Bogorff. Concept (3), espoused by Judge Ryder's opinion in this case in apparent avoidance of concept (2), not to mention concept (1), could be taken to be another way of stating concept (4), as discussed above and especially as explained in section IV(b) below.
(b) The Criterion of the Partially Dissenting Opinion that the Injury Must be "Completely Unexpected" in Order That the Foregoing Requirement of Notice of Possible Negligence May be Met Would Require Notice of Negligence to Trigger the Statute

As we have said, in Goodlet the majority opinion declined to say specifically whether only notice of injury is enough to trigger the medical malpractice statute of limitations or whether notice of defendant's involvement with the injury is additionally necessary, saying that, in any event, both were present in that case. In applying the test set out in the Goodlet and Jackson concurring opinions, we agree with Judge *769 Ryder's opinion in this case when it goes further than the Goodlet majority opinion in that regard and says that "notice of more than mere injury is needed for the statute of limitations to begin to run."[4]
If notice of only injury triggered the statute, there would not have to be any notice whatsoever of who may have been responsible for the injury or even how it might have been inflicted. Plaintiffs in wrongful death medical malpractice cases against treating physicians would be barred by the statute even without any evidence that they had had any notice at all within the two year period following the death that any such treatment occurred or that such defendants even existed. That is, their complaints would be eliminated by the statute of limitations without there having been evidence even of any possibility of their bringing a lawsuit against a particular defendant during that period, regardless of how diligent they had been. See Goodlet, 586 So.2d at 77 (Lehan, J., concurring). The four-year statute of repose under section 95.11(4)(b) is designed to deal with those kinds of cases by protecting physicians from never ending concerns about potential lawsuits, not the relatively short two-year statute of limitations. Id. Furthermore, as the Goodlet concurring opinion said,
In contrast [to the medical malpractice statute of limitations] is the statute of repose which may be triggered by only the occurrence of medical malpractice, with or without notice thereof to plaintiff, if there is then notice to plaintiff of the existence of injury and, if there is not, as in Nemeth v. Harriman, 586 So.2d 72 (Fla. 2d DCA 1991) and Lloyd v. North Broward Hosp. Dist., 570 So.2d 984 (Fla. 3d DCA 1990) (review granted), then by notice to plaintiff of injury when that notice occurs. Thus, if, contrary to my conclusion, only notice of injury triggered the statute of limitations, there would effectively be in all cases, and especially in situations like those in Nemeth and Lloyd, no practical difference between triggering the statute of limitations and the statute of repose. That is, in cases alleging the occurrence of medical malpractice both statutes would be effectively triggered by notice of injury. Yet those two types of statutes are to be triggered differently. See Bogorff, 583 So.2d at 1002.
586 So.2d at 77.
Yet we agree with the Goodlet majority opinion that what has been needed to clear up confusion in the law in this area is the answer to what that opinion refers to as the "critical question" of "what minimum facts are essential to give the plaintiff notice that a timely investigation should begin in order to discover any additional facts needed to support a medical negligence action." 586 So.2d at 75 (emphasis in original). That opinion then goes on to explore various types of "minimum facts" which might be those that are essential but does not pin down which types are essential, id. at 76, as does this opinion, as did the concurring opinions in Jackson and Goodlet, *770 and as would Judge Ryder's opinion in this case in a different manner. Yet again, the Goodlet majority opinion does say, and hold in effect, that whether or not notice of only injury constitutes notice of sufficient minimum facts to trigger the statute, certainly notice of injury and of defendant's involvement therewith (essentially the test stated in the Goodlet and Jackson concurring opinions) does constitute such notice. Thus, the Goodlet majority opinion stands for the proposition that if notice of injury alone is insufficient to trigger the statute, as both this opinion and Judge Ryder's opinion in this case consider to be the law, notice of injury and of defendant's involvement therewith (i.e., notice of the incident involving defendant resulting in the injury) is sufficient.
But Judge Ryder's opinion, in espousing the requirement of notice of possible negligence, would require as the criterion for the minimum facts which are necessary to show notice of possible negligence, "notice of a completely unexpected result from the treatment sought." That opinion thereby, if adopted, would be in conflict with Goodlet by requiring notice of different, and more, such minimum facts than does Goodlet. In that regard, Judge Ryder's opinion says that "in order for a person to be on notice of a possible invasion of their legal rights, to commence the running of the medical malpractice statute of limitations, they must have notice of an occurrence which is unusual; notice of a completely unexpected result from the medical treatment sought." (Emphasis added.) That criterion for minimum facts, notice of which triggers the statute, would seem to constitute a wholly new criterion, the application of which would seem to depend upon a determination of how a plaintiff subjectively reacts to learning of the injury.
Furthermore, that criterion would: (a) seem exceedingly more favorable to plaintiffs (or, perhaps more to the point, exceedingly less favorable to defendants) than any interpretation of the stated, literal supreme court criterion of whether plaintiff had sufficient notice of only "the injury"; (b) would not fit into not only the test of the Goodlet and Jackson concurring opinions and the holding of the Goodlet majority opinion as explained above, but would not even fit into the Goodlet majority opinion's exploration of other possible types of "essential facts" referred to above, notice of which might arguably be considered as being the minimum for triggering the statute short of notice of negligence; and (c) would create a whole new ball game in this area, having the at least potential future effect of precluding judgments for defendants in all medical malpractice cases on the statute of limitations issue where there has been no notice of negligence. That is, if an injury from treatment by a doctor must be completely unexpected in order to trigger the statute, then notice thereof would naturally be concluded to be notice that something went wrong with the treatment, which is notice of negligence.
Whether requiring notice of negligence to trigger the statute would be appropriate or not is of course not the point. The point is that that would be inconsistent with controlling prior case law of this court and of the supreme court interpreting legislative policy in that regard.
It should be emphasized that Judge Ryder's opinion in this case would create conflict with the majority opinion in Goodlet even to the extent that the Goodlet majority opinion differs from the concurring opinions in Goodlet and Jackson. In fact, even more so. That is, as indicated above, to trigger the statute the Goodlet majority opinion does not necessarily exclude a minimum requirement of relatively slight notice consisting only of notice of injury, as do those concurring opinions (and as we do and as would Judge Ryder's opinion) and holds that, in any event, the statute was triggered in that case where there was notice of both the injury and of defendant's involvement with the injury, which is essentially what those concurring opinions would require. On the other hand, Judge Ryder's opinion in this case would conflict with both the Goodlet majority opinion and those concurring opinions by mandating a stronger requirement of notice to plaintiff to trigger the statute than does either the *771 Goodlet majority opinion or would those concurring opinions by requiring notice of possible negligence, the application of which, especially as governed by the criterion of notice of a completely unexpected injury, requires notice of negligence to trigger the statute.
The greater conflict of Judge Ryder's opinion with the Goodlet majority opinion than with the Goodlet and Jackson concurring opinions and our opinion in this case may be thought of in another way. Obviously the requirement of notice of negligence, or possible negligence, as called for by Judge Ryder's opinion would mandate much more notice before the statute of limitations may be triggered than does the literal supreme court minimum requirement of mere notice of injury. The former mandates notice of the circumstances resulting in the injury while the latter does not. In contrast, the Goodlet and Jackson concurring opinions called for, and this opinion requires, lesser notice of the circumstances than would Judge Ryder's opinion and greater notice than necessarily does the majority opinion in Goodlet (because it does not necessarily exclude mere notice of injury) by requiring notice of the injury and of some of the circumstances through the requirement of notice of the injury and "the incident involving defendant resulting in the injury."
Furthermore, there does not appear to be any basis for the statement in Judge Ryder's opinion in this case which attempts to reconcile Goodlet. In that regard that opinion states that in Goodlet, where the statute of limitations was found to have run, "the injury was ... a completely unexpected result from the treatment sought." However, neither the majority opinion nor the concurring opinion in Goodlet either indicates that or indicates that such an aspect had anything to do with this court's decision in that case. In fact, the Goodlet majority opinion, by saying that there was in the record in that case no information as to when plaintiff knew her daughter had been hospitalized or knew of the treatment received by her daughter in the hospital, 586 So.2d at 75, indicates that there was no basis for this court to know in that case whether or not the injury (for present purposes, the death) was or was not unexpected.
And, as Judge Ryder's opinion in this case concedes, the injury in this case (for present purposes, the death) was a surprise to plaintiff. Whether the restrictive term "completely" by which that opinion modifies its proposed requirement of unexpectedness could or would be conscientiously and meaningfully distinguished by a jury from mere unexpectedness is another problem. That restrictive term could be seen as giving a jury a basis to avoid the running of the statute of limitations in virtually all medical malpractice cases.
Accordingly, the following statement in Judge Ryder's opinion appears clearly contrary to the holding of this court in Goodlet as explained above, as well as to the concurring opinions in Goodlet and Jackson: "[N]otice of an injury [death] coupled with notice that a particular doctor treated the injured person, resulting in the injury, simply cannot be said, as a matter of law, to put a person on notice of a possible invasion of their legal rights in every instance [so as to trigger the medical malpractice statute of limitations]." That opinion's quotation from the Jackson concurring opinion in purported support of that statement refers only by ellipses to the concluding words in that part of the Jackson concurring opinion which actually point up the inconsistency of Judge Ryder's opinion in this case with Goodlet. That part of that concurring opinion says, as shown by that quotation in Judge Ryder's opinion in this case, that simply knowledge or notice of injury and of the fact that defendant had treated plaintiff does not automatically trigger the statute of limitations when there are fact questions as to whether the requisite knowledge or notice existed. But that part of that concurring opinion concludes with the following words represented only by those ellipses in Judge Ryder's opinion: "for example, whether there was notice that the injury to plaintiff resulted from treatment by defendant." 552 So.2d at 220 (emphasis added). See footnote 3, supra. There is shown to be no *772 such fact question in this case about whether there was notice that the death resulted from the operation by defendant physician at defendant hospital which could create any doubt that the statute of limitations was triggered.
(c) The Partially Dissenting Opinion Would be in Conflict With the Most Recent Florida Supreme Court Pronouncement in this Area of the Law in Bogorff

In any event, whether or not Judge Ryder's opinion would be in conflict with Goodlet as discussed in sections IV(a) and (b) above, whether or not his opinion's requirement of "notice of possible negligence" is questionable for the reasons discussed in section IV(a) above, and whether or not that opinion's criterion of a "completely unexpected injury" for the application of that requirement impermissibly requires notice of negligence as discussed in section IV(b) above, that requirement, and certainly that criterion, are in conflict with the reasoning of controlling supreme court case law, notably Bogorff, as described in section II above.
Reversed and remanded for proceedings consistent herewith.
PARKER, J., concurs specially.
RYDER, A.C.J., concurring in part and dissenting in part.
PARKER, Judge, concurring.
I agree with both Judges Ryder and Lehan that the summary judgment should be reversed because there is a factual issue of whether fraudulent concealment by the doctor and hospital tolled the statute of limitations in this case.
Further, I agree with Judge Lehan that this court's decision in Goodlet and the supreme court's decision in Bogorff require that the statute of limitations' clock starts running upon the death of Mr. Rogers. I wish I could agree with Judge Ryder that something more than a death is required to put the plaintiff on notice that the limitations' period had begun to run. Bogorff, however, in my opinion, has slammed that door shut.
It is my belief that Bogorff rips at the very fabric of our society. The message in that case is clear. Once the body is in the ground or once an adverse result occurs from a medical procedure, a grieving family member or dissatisfied patient, in order to protect a possible and unknown right to damages, should retain an attorney immediately and start subpoenaing medical records. This, to me, is a further wedge driven between formerly trusting relationships involving hospitals, doctors, patients, and attorneys. The message is clear. If one thinks anything adverse possibly could have happened to him or her or to a loved one while undergoing medical care, one immediately must demand all medical records and retain an expert to review those records and to advise the patient or family. This appears to be the only prudent way to proceed to avoid the statute of limitations' window closing upon an action for medical malpractice, even when the family or patient has nothing tangible which would indicate to a lay person that malpractice has occurred.
RYDER, Acting Chief Judge, concurring in part and dissenting in part.
I agree with the majority opinion that a question of fraudulent concealment, which may have tolled the statute of limitations, precludes summary judgment in this case. However, I disagree with the majority and concurring opinions which hold that the statute of limitations was triggered when Mrs. Rogers learned of Mr. Rogers' death and thereby had sufficient notice to investigate further.
Because Mrs. Rogers did not actually discover her causes of action within two years of the "incident giving rise to the action," the question becomes, when the causes of action "should have been discovered with the exercise of due diligence." Section 95.11(4)(b), Fla. Stat. (1987). Appellees both argue that the injury which should have put Mrs. Rogers on notice, in this case, was Mr. Rogers' death and that Mrs. Rogers had notice of the death on May 28, 1985.
*773 Alternatively, both Dr. Ruiz and the hospital argue that even if Mrs. Rogers was not put on notice by the death, that Dr. Christ's statement to her that he would have liked to try medication gave her constructive notice of the possible invasion of her legal rights. Appellees argue that Mrs. Rogers' testimony that she took Dr. Christ's statement to be "indirectly critical" of Dr. Ruiz and that it "ate at [her]" showed that she was suspicious and therefore should have discovered her causes of action against Dr. Ruiz and the hospital at that time; but, that instead, Mrs. Rogers made a conscious decision not to pursue any investigation or inquiry. However, Mrs. Rogers testified that she understood Dr. Christ's comment to mean only that Dr. Christ would have liked to have tried medication instead of bypass surgery and not as a criticism of the manner in which the surgery itself had been performed. Further, I am of the opinion there is nothing in Dr. Christ's comment that would have put Mrs. Rogers on notice of her negligence claim against the hospital.
Appellees argue that the constructive notice in this case is the same type of constructive notice as in Nardone. In Nardone, a 13-year-old boy was recovering exceptionally well, when suddenly his condition changed radically for the worse. Ultimately, the boy suffered irreversible brain damage and was in a vegetative state. Appellant, on the other hand, argues that the injury in this case was unlike the one in Nardone, because here, death was a "statistically predictable consequence" of bypass surgery. Appellant argues that the injury in Nardone was not a "statistically predictable consequence" of the surgery performed by the medical professional. See also Bogorff (motion for rehearing denied August 29, 1991) (boy treated for leukemia ended up a quadriplegic and severely brain damaged); Barron v. Shapiro, 565 So.2d 1319 (Fla. 1990) (plaintiff underwent colon surgery and came out blind). Appellant argues that in these cases the injuries were more apparently the result of a botched surgery and negligent postsurgical care, sufficient to put a reasonable person on notice of their potential claim for malpractice. I agree.
This case is also distinguishable from our recent decision in Goodlet. In Goodlet, a young woman went to the hospital for a pain in her leg. She was treated by the doctor and died of cardiac arrest the next day after returning to the hospital. The mother of the deceased was contacted by the treating physician and told that he treated her daughter and that she had died. The type of injury in Goodlet along with the information provided by the doctor was sufficient to put Mrs. Goodlet on notice of a possible invasion of her legal rights.
Notice of more than mere injury is needed for the statute of limitations to begin to run. Notice of a possible invasion of one's legal rights is necessary before it can be claimed that one should have discovered their cause of action. See Nardone; Vargas v. Glades General Hospital, 566 So.2d 282 (Fla. 4th DCA 1990); Weiner v. Savage, 407 So.2d 288 (Fla. 4th DCA 1981). Mrs. Rogers did not have any notice of a possible invasion of her legal rights. Mrs. Rogers had notice only that her husband died on the operating table during bypass surgery performed by Dr. Ruiz. Although notice of negligence is not necessary to trigger the statute of limitations, notice of an injury (death) coupled with notice that a particular doctor treated the injured person, resulting in the injury, simply cannot be said, as a matter of law, to put a person on notice of a possible invasion of their legal rights in every instance. Some factual situations may require something more. As Judge Lehan states in his concurring opinion in Jackson, "simply knowledge or notice of injury and of the fact that defendant had treated plaintiff [may not] automatically trigger the statute. In particular cases there may be fact questions as to whether the requisite knowledge or notice existed... ." See Jackson, 552 So.2d at 220 (Lehan, J., Concurring).
Various cases decided by the Florida Supreme Court have stated that the fact that the plaintiff knew that the defendant doctor had treated the injured person and that the plaintiff knew of the injury is sufficient *774 notice to begin the statute running. Although the supreme court has never elaborated on the type of injury involved, all of the injuries in those cases were out of the ordinary, unusual type results from the medical treatment sought which should have put a reasonable person on notice of further inquiry. See Bogorff; Barron; Nardone. The injury in the case sub judice was not so unexpected or unusual so that it can be said as a matter of law that Mrs. Rogers should have been on notice to inquire further. In the same way, this case is also distinguishable from our prior decision in Goodlet, where the injury was also a completely unexpected result from the treatment sought. This is not to say that notice of negligence is required to put a person on notice, but instead that notice of something out of the ordinary is needed to put a reasonable person on notice that there may have been negligence involved in the medical treatment.
Appellees argue that because Mrs. Rogers was surprised about Mr. Rogers' death and because everyone expected the surgery to go well that "this is not a case where the disastrous consequences of the surgery did not become apparent until less than two years before the suit was filed." Barron. Appellees contend that Mr. Rogers' sudden death should have triggered an inquiry by Mrs. Rogers, but it did not. In this case, Mr. Rogers underwent coronary artery bypass surgery and died on the operating table. Although the chances of Mr. Rogers surviving the operation were good, there was still a chance that he would not survive. Just because Mrs. Rogers was surprised by the death of her husband is insufficient to put her on constructive notice, as a matter of law, under Florida case law. The type of injury which occurred in this case was not completely unexpected, unlike the injuries in Nardone, Bogorff and Barron. Under these circumstances, a question of fact for the jury exists.
In order for persons to be on notice of a possible invasion of their legal rights, to commence the running of the medical malpractice statute of limitations, they must have notice of an occurrence which is unusual; notice of a completely unexpected result from the medical treatment sought. This type of notice should prompt further investigation by the person to determine whether the incident involved negligence. In addition, the determination as to whether the resulting injury was unusual or unexpected, is one for the jury. The question for the jury being whether a reasonable person should have been put on notice of the possible involvement of negligence under the given circumstances of the case.
As stated by the majority, summary judgment should be cautiously granted in negligence and malpractice suits. Moore. If the record raises even the slightest doubt that an issue might exist, summary judgment is improper. Crandall; Cohen; Gomes. In the case sub judice, there is a question of fact for the jury to determine whether a reasonable person should have been put on notice that negligence may have been involved in the medical treatment of Mr. Rogers. See Nardone; Weiner.
NOTES
[1] The portion of the memo in brackets is taken from plaintiff's transcription of the original memo contained in her initial brief. That portion of the copy of Nurse Burch's memo furnished to the court is not legible.
[2] The term "negligent act" in this context refers to negligence, not simply the act which may ultimately be found to have been negligent. See Bogorff, 583 So.2d at 1002. See also Jackson, 552 So.2d at 219-20 (Lehan, J., concurring).
[3] It might be initially thought that in medical malpractice cases there would seem to be no substantial difference between notice of injury, on the one hand, and notice of injury and of the incident involving defendant resulting in the injury, on the other, i.e., that in at least 99% of the cases one having notice of an injury would also have notice that the injury resulted from medical treatment by a particular defendant. However, that may not be the case, particularly in wrongful death situations in which what the decedent knew is not at all necessarily what the personal representative of the decedent knows. See Goodlet, 586 So.2d at 77 (Lehan, J., concurring).

Also, that test stated in the Jackson and Goodlet concurring opinions which has been applied in this case is that in order to trigger the statute, there must be, in addition to bare notice of injury, notice of the incident involving defendant resulting in the injury. As to whether there was notice that a particular injury resulted from a particular incident of medical malpractice by a particular defendant, there may be, and have been in the reported cases, factual questions when it appears that the injury may have resulted from something else. See Jackson, 552 So.2d at 220-21, and cases cited therein (Lehan, J., concurring).
[4] It is unclear why Judge Parker's concurring opinion in this case expresses the wish that he "could agree with Judge Ryder that something more than a death is required to put the plaintiff on notice that the limitations period had begun to run." Nor is it clear why his opinion then goes on to say, "Bogorff, however, in my opinion, has slammed that door shut." Such "something more" was provided to plaintiff, and triggered the statute, in this case, albeit not as much more as Judge Ryder's opinion calls for, as explained above. That was, of course, notice of the death and of the incident involving defendants resulting in the death, which, as explained above, is the kind of minimum notice effectively confirmed by Bogorff to trigger the statute. Judge Parker's concurring opinion does not say that he would feel bound by Bogorff to consider the statute to be triggered by notice of injury (death) alone.

Judge Parker's opinion also says, "I agree with Judge Lehan that this court's decision in Goodlet and the supreme court's decision in Bogorff require that the statute of limitations' clock starts running upon the death of Mr. Rogers" (emphasis added). Presumably that means he agrees with this opinion that that "clock" started running, as this opinion has said, "at the time plaintiff was informed of her husband's death from the surgery by defendant physician at defendant hospital" (emphasis added) (not simply, as Judge Parker's opinion might be taken to indicate, "upon," i.e., by reason of, that death), at which time she received notice not only of that death but of the incident involving defendants resulting in that death.