598 So.2d 105 (1992)
Byron NORSWORTHY, etc., Appellants,
v.
HOLMES REGIONAL MEDICAL CENTER, INC., et al., Appellees.
No. 91-1367.
District Court of Appeal of Florida, Fifth District.
April 3, 1992.
Rehearing and Rehearing Denied May 19, 1992.
Wagner, Cunningham, Vaughan & McLaughlin, P.A., Tampa, and Joel D. Eaton of Podhurst, Orseck, Josefsberg, Eaton, Meadow, Olin & Perwin, P.A., Miami, for appellants.
Joseph M. Taraska and A. Scott Noecker of Taraska, Grower, Unger & Ketcham, P.A., Orlando, for appellees Barry S. Kronman, M.D. and ENT Health and Surgical Center, Barry S. Kronman, M.D., P.A.
No appearance for appellee, Holmes Regional Medical Center, Inc.
Rehearing and Rehearing En Banc Denied May 19, 1992.
GRIFFIN, Judge.
This is the appeal of a summary final judgment premised on the expiration of the *106 statute of limitations in a medical malpractice case. We reverse.
On March 15, 1985 Mr. and Mrs. Norsworthy's ten and one-half month old son, Byron, developed laryngotracheobronchitis, a viral infection commonly known as "croup", and was hospitalized. He experienced increasing difficulty breathing and his treating pediatrician called for a consult from an otolaryngologist [ear, nose and throat specialist ("ENT")]. Appellee, Dr. Kronman, was on call and began treating Byron on March 18. Because of the swelling of his airway in the area below the vocal cords (subglottis), it was necessary to provide a substitute airway, either by intubation or tracheotomy. Dr. Kronman elected intubation. Byron thereafter began to improve and the tube was removed. The child subsequently began to fail and was reintubated. Once again the child improved and Dr. Kronman removed the tube. After observing Byron's continued breathing difficulty, a tracheotomy was performed. Upon discharge from the hospital, Dr. Kronman estimated the "trach" tube could be removed in two weeks to a month.
The Norsworthys continued with Dr. Kronman until mid-April, 1985 when they decided to change doctors because they were concerned about the somewhat casual attitude Dr. Kronman appeared to have about the "trach" tube removal procedure, and they had been told by others that another ENT specialist, Dr. Dickinson, was better.
The testimony of Dr. Dickinson and the Norsworthys concerning their subsequent discussions is in conflict. Dr. Dickinson claimed she told the Norsworthys that Byron had subglottic stenosis, a narrowing of the airway at the subglottis that may have resulted from a mechanical trauma during the intubation. ("I think I was trying at that time to get them to understand ... that indeed sometimes further irritation is inescapable.") Her own notes suggest she communicated that subglottic stenosis is an "unfortunate" result that may occur in such "life threatening situations." The Norsworthys conceded that Dr. Dickinson told them that ENT's don't like intubations because they can cause problems but she also said that tracheotomies have problems of their own. Mrs. Norsworthy testified Dr. Dickinson told them there was no deviation from the norm in Dr. Kronman's care. Mr. Norsworthy testified Dr. Dickinson had expressed the view that Dr. Kronman's care had been competent and professional.
In June 1985, the Norsworthys relocated to Pennsylvania, where Mr. Norsworthy had found a better job and Byron went under the care of Dr. Tucker, a specialist in the field of pediatric airway management. Dr. Tucker testified that the Norsworthys had always seemed upset about the outcome of their son's illness but it was not until early 1989, after Byron's trach was finally removed, that Mr. Norsworthy asked him to review the records of the original hospitalization and evaluate the medical care Byron had received. Dr. Tucker did so and advised them that Byron's subglottic stenosis was, in his opinion, an injury caused by inappropriate and negligently administered intubations. A few weeks later, on June 28, 1989 (within Florida's four-year statute of repose)[1] the Norsworthys filed suit against Dr. Kronman.
The issue is when the statute of limitations began to run in this case. Like the other district courts of appeal, we are called upon to apply the recent rulings of the Florida Supreme Court in University of Miami v. Bogorff, 583 So.2d 1000 (Fla. 1991) and Barron v. Shapiro, 565 So.2d 1319 (Fla. 1990) in attempting to determine whether the two-year statute of limitations applicable to medical malpractice actions had expired as a matter of law prior to the filing of this lawsuit. See, e.g., Tanner v. Hartog, 593 So.2d 249 (Fla.2d DCA 1992), question certified on motion for reh.; Rogers v. Ruiz, 594 So.2d 756 (Fla.2d DCA 1991); Vellanti v. Maercks, 590 So.2d 495 (Fla.3d DCA 1991). Like the other district courts, we find that applying the rule of Barron and Bogorff to the widely divergent fact patterns presented by such cases is not easy.
*107 The Bogorff and Barron decisions are clear that the statute of limitations begins to run from the date of "injury" where the facts are such that any reasonable person would recognize that the injury probably resulted from some act or omission of medical personnel. The difficulty lies in defining "injury" and in judging when the injury carries with it sufficient inference of medical negligence that the victim is deemed to have notice of the "incident" of malpractice. Barron and Bogorff can be broadly read to mean that any adverse physical event arising in the course of medical care triggers the statute of limitations. See Tanner, 593 So.2d at 252 (when pregnant woman was admitted to the hospital for delivery of her baby but the baby was stillborn, the statute of limitations began to run on the date of the stillbirth). The above-cited recent opinions suggest that some of Florida's intermediate appellate court judges are finding that imputing knowledge of an incident of medical malpractice based on mere knowledge of some injury that occurred in the course of medical care is a harsh rule.[2]
Perhaps we read Bogorff and Barron too optimistically, but we believe those cases simply stand for the proposition that when the nature of the bodily damage that occurs during medical treatment is such that, in and of itself, it communicates the possibility of medical negligence, then the statute of limitations begins to run. On the other hand, if there is nothing about an injury that would communicate to a reasonable lay person that the injury is more likely a result of some failure of medical care than a natural occurrence that can arise in the absence of medical negligence, the knowledge of the injury itself does not necessarily trigger the running of the statute of limitations.
This appears to have been what occurred in both Bogorff and Barron. In Bogorff, the supreme court found the victim's developing severe symptoms and lapsing into a coma triggered the statute of limitations where the leukemia for which the victim had been under treatment was in remission and the treatment whose negligent administration actually caused the injury had been done as a purely prophylactic measure. Similarly, in Barron, the victim had gone into the hospital for removal of polyps in his colon and left the hospital blind.
In Nardone v. Reynolds, 333 So.2d 25 (Fla. 1976) the case relied on most strongly in both Barron and Bogorff, a thirteen-year old boy who had been experiencing difficulty in coordination, blurred vision, dyplopia and headaches, was admitted to the hospital and underwent two surgical procedures that resulted in marked and steady improvement such that he was told he could shortly go home. Then, after a diagnostic procedure subsequently performed on him, he immediately began to suffer severe symptoms, including constant headaches, drowsiness, incoherence, projectile vomiting. Within two weeks, he had deteriorated into a vegetative state. The Nardone court concluded that these circumstances were enough to put the parents on notice that their son may have been the victim of malpractice during the diagnostic procedure.
On the other hand, the Bogorff court also reaffirmed its earlier holding in Moore v. Morris, 475 So.2d 666 (Fla. 1985). In Morris, *108 the court reversed a ruling by the lower court that, as a matter of law, the plaintiffs were on notice of malpractice because they knew of oxygen deprivation at the time of their child's birth. The Morris court explained:
There is nothing about these facts which leads conclusively and inescapably to only one conclusion  that there was negligence or injury caused by negligence. To the contrary, these facts are totally consistent with a serious or life threatening situation which arose through natural causes during an operation. Serious medical circumstances arise daily in the practice of medicine and because they are so common in human experience, they cannot, without more, be deemed to impute notice of negligence or injury caused by negligence.
Id. at 668. Concededly, the Morris court also noted that their conclusion that the parents did not have notice was "particularly true where ... the baby physically appeared to have made speedy and complete recovery" (i.e., there was no "injury") but that is plainly not the focus of the court's reasoning.
In discussing Moore v. Morris in the Barron case the supreme court did say:
The district court of appeal misinterpreted Moore [v. Morris] when it said that knowledge of physical injury alone, without knowledge that it resulted from a negligent act does not trigger the statute of limitations.
Barron, 565 So.2d at 1321. We do not believe the supreme court intended by this statement to say that knowledge of physical injury alone will always trigger the statute of limitations; merely that it is erroneous to suppose that knowledge of injury alone cannot trigger the statute. Some injuries, as in Nardone, Barron and Bogorff, speak for themselves and supply notice of a possible invasion of legal rights. That is not to say, however, that all injuries carry that same communication. As the fourth district recently said in Southern Neurosurgical Associates, P.A. v. Fine, 591 So.2d 252 (Fla. 4th DCA 1991):

Moore v. Morris, 475 So.2d 666, 668 (Fla. 1985) supports the view that knowledge that one suffered injury during or subsequent to an operation, which could be supposed to have arisen out of natural causes, need not constitute notice of negligence or injury caused by negligence.
Id. at 256.
We must view the facts in the record of this case most favorably to the nonmoving party, as is appropriate in summary judgment cases. The Norsworthys' child was hospitalized because he was having difficulty breathing due to the complications of the viral infection, including swelling of the airway below the vocal cords at the subglottis. It was necessary to provide an alternative vehicle for the child to breathe. Two methods were available, the method preferred by the physician was tried and, when it was not successful, the alternative method was used. Thereafter, the child was diagnosed as having subglottic stenosis, the narrowing of the airway below the vocal cords. Even if the Norsworthys were aware that the initial cause of the closure of the airway was different from the subsequent cause, and if they knew that subglottic stenosis could result from intubation, there is little, if anything, in this record to suggest that the "injury" was the result of anything other than natural consequences of a recognized medical treatment competently performed. We cannot analogize the facts of this case to Bogorff and Barron enough to say that, as a matter of law, when the Norsworthys learned of their son's subglottic stenosis they were placed on notice of the incident giving rise to medical malpractice.[3] Nor *109 could we say exactly when the statute would have been triggered.
In this case, the jury may well find the Norsworthys were on notice of malpractice before 1989, or they may find, based on the nature of the injury and the information the Norsworthys were given, that the statute of limitations does not bar this claim.
REVERSED.
GOSHORN, C.J. and PETERSON, J., concur.
NOTES
[1] The Norsworthys had timely filed a petition to extend the statute of limitations.
[2] Tanner v. Hartog, 593 So.2d 249, 253 (Fla.2d DCA 1992); question certified on motion for reh. (Patterson J., dissenting):

I am disturbed by the trend in this area of the law which creates a fiction that a normal, but unfortunate, incident of proper medical care and treatment in the eyes of a lay person is in fact legal notice of possible malpractice.
A party litigant should be given the opportunity to establish by competent evidence that they fall within circumstances defined by the legislature to protect unwary and uneducated persons from the harsh consequences of their ignorance of the pitfalls of medical treatment.
Rogers v. Ruiz, 594 So.2d 756, 764 (Fla.2d DCA 1991):
Thus, whether or not one may feel that a plaintiff's medical malpractice suit should not be barred by the statute by reason of the plaintiff, who had no notice of negligence, having received only the relatively slight notice of the injury more than two years prior to the service of the presuit notice, we are bound by the foregoing parameters established by the supreme court.
[3] Another aspect of the Bogorff decision is worthy of consideration in this case. The supreme court in Bogorff found there was a question of fact of fraudulent concealment in that case that would have tolled the running of the statute of limitations. The supreme court noted in Bogorff:

An attending physician has a strong duty to address the concerns of patients and to be fully candid with them.
583 So.2d at 1003.
If lay persons are to be charged with notice that there may have been an invasion of their legal rights simply upon knowledge of an "injury," this concomitant duty of disclosure on the part of medical professionals concerning the possible causes should be given substance, as it was in Bogorff.