ALTENBERND, Judge,
dissenting.
The frustration expressed in this dissent is not aimed at my colleagues. I know that they have reluctantly reached this decision because, after a thorough analysis, they have concluded the law compels them to reach this result. My frustration is aimed at a framework of statutes and case law which forces fair and practical jurists to reach a result that is neither fair nor practical.
Chad M. Patry was born on May 30, 1988. He suffers from cerebral palsy and quadriplegia. Dr. William L. Capps delivered this child by Caesarian section after Mrs. Patry experienced difficulties during labor.
Although Dr. Capps strongly disagrees, Mr. and Mrs. Patry believe their son’s condition was caused by his negligence. They hired Richard A. Bokor to represent their son. He investigated the claim. In May *263 1990, he obtained an opinion from Dr. Donald J. Sewell that Dr. Capps’ delay in this delivery fell below the appropriate standard of care and was a contributing cause of the child’s injuries.
Mr. Bokor knew that the two-year statute of limitations was fast approaching. Section 768.57(4), Florida Statutes (1987), requires a notice of intent to initiate litigation to be “served” within the time limits set forth in the statute of limitations.[2] Section 768.57(2), Florida Statutes (1987), further states:
Prior to filing a claim for medical malpractice, a claimant shall notify each prospective defendant by certified mail, return receipt requested, of intent to initiate litigation for medical malpractice.
On Wednesday, May 80, 1990, Mr. Bokor prepared a notice of intent to Dr. Capps and William L. Capps, M.D., P.A. He gave it to Patricia Nicholas. She hand delivered the notice to Dr. Capps’ office and gave it to his receptionist. The receptionist allegedly agreed to give the letter to Dr. Capps as soon as possible. Ms. Nicholas thereafter prepared an affidavit to establish delivery of the letter. Dr. Capps has admitted under oath that he received the letter at 9 a.m. on May 31, 1990.
Dr. Capps takes the position that the two portions of section 768.57 must be read together and that the service of the notice, as a matter of substantive law, must be accomplished by registered or certified mail. I recognize that the United States Postal Service is efficient. Nevertheless, it seems obvious that Ms. Nicholas delivered this notice of intent faster than postal delivery and with adequate written proof of timely delivery. I cannot accept a rule which deprives this child of his constitutional right to access to this state’s courts merely because Ms. Nicholas was not wearing blue-gray shorts and did not have an American eagle embroidered on her shirt sleeve when she delivered this notice. There is something desperately wrong with our system of medical malpractice and tort reform if this technical defect in service— which resulted in the doctor receiving faster notice — is a matter of substantive law that forever bars this claim.[3]
Solimando v. International Medical Centers, 544 So.2d 1031 (Fla. 2d DCA 1989), review dismissed, 549 So.2d 1013 (Fla.1989), did not involve timely hand delivery. It involved a notice which was simply placed into the mail. Thus, the plaintiff could not prove actual, timely delivery. Candidly, I am inclined to believe I would have dissented had I participated in the Solimando decision. A nonprejudicial, technical error concerning the method of delivery of a notice should not be treated as an issue of substantive law.
A month before the Solimando decision, I authored an opinion which held that timely, actual written notice of a coverage defense under section 627.426, Florida Statutes (1985), was legally sufficient and that an insurance company could be forgiven for the technical failure to use registered or certified mail. Phoenix Ins. Co. v. McCormick, 542 So.2d 1030 (Fla. 2d DCA 1989). CNA Insurance Company is Dr. Capps’ malpractice carrier and the real winner in this lawsuit. Ironically, it refuses to forgive a technical failure in service that is virtually indistinguishable from the forgiven error in Phoenix. Apparently, the law expects more of the guardians of brain-damaged children than it does of large, well-staffed corporations. If this is true, Mr. Bumble is correct: “[T]he law is a ass, a idiot.” Charles Dickens, Oliver Twist 399 (Oxford Press ed., 1961) (1839).
In Williams v. Campagnulo, 588 So.2d 982 (Fla.1991), the supreme court held that *264 a plaintiffs total failure to provide a notice of intent required dismissal of a medical malpractice action. It ruled that the notice was a condition precedent and stated, “We reject the contention that the notice requirement of section 768.57 is procedural and, as such, is an unconstitutional invasion of our exclusive rule-making authority.” 588 So.2d at 983. I admit that this language supports the majority’s opinion today. But Justice Overton’s opinion for the supreme court continued with the statement: “We find that the statute is primarily substantive and that it has been procedurally implemented by our rule 1.650, Florida Rules of Civil Procedure.” Id. (emphasis added). The overall notice and pre-suit screening process may be a substantive condition precedent to a lawsuit. I cannot accept the concept that the precise method of delivery of actual written notice is a substantive element of a medical malpractice claim.
Courts have always liberally construed Article I, Section 21, of the Florida Constitution, limiting their own power to proee-durally restrict access to courts. Lehmann v. Cloniger, 294 So.2d 344 (Fla. 1st DCA 1974); Shova v. Eller, 606 So.2d 400, 409 (Fla. 2d DCA 1992) (Altenbernd, J., dissenting). I would suggest that a judicial interpretation of section 768.57 that makes the requirement for registered or certified mail a matter of substantive law and requires strict statutory compliance without regard to prejudice, violates the spirit, if not the letter, of the constitutional right of procedural access to courts.
Dr. Capps should understand that this result is not necessarily a victory for him. Even though his insurance company has won this case and may no longer need to defend him, Dr. Capps will likely be a prominent figure in litigation arising from this incident for years to come. At this point, Mr. and Mrs. Patry will undoubtedly sue Mr. Bokor for legal malpractice. To prevail against him, they will need to prove that Dr. Capps committed medical malpractice. Thus, although his assets will not be directly at risk, Dr. Capps’ professional reputation will still be at stake in a public trial. He will still be called as a witness, and other doctors will still render professional opinions that his medical malpractice contributed to this poor child’s tragic condition.
It is apparent from the record that Dr. Capps strongly believes that he committed no malpractice, and his attorneys believe that his position is fully defensible on the merits in a court of law. Unfortunately for Dr. Capps, the jury that decides this question, which will affect his professional reputation, will not have the benefit of any arguments by attorneys representing him. It seems far more likely that a jury will rule against Dr. Capps in the context of a lawsuit where he is not entitled to representation.
The legislature created this presuit investigation process and a short statute of limitations for medical malpractice claims because of a perceived medical malpractice crisis. I accept, at least as a premise worthy of careful research and discussion, that the common law tort system, while protecting the public from malpractice, may have resulted in “defensive medicine,” and may add avoidable costs to an already costly health care system. This perceived crisis, however, is not resolved by adding complex and expensive procedural roadblocks to the litigation process.
The quick presuit process and the short statute of limitations have created at least two unfortunate results. First, they force claims to be filed prematurely by lawyers who might not file a lawsuit under the more deliberate time limits and investigation allowed by the common law. A lawyer no longer has the luxury of waiting two or three years to see whether a lawsuit is truly warranted.
Second, recent cases interpreting the statute of limitations clearly disclose that these statutory reforms also tend to close our courts to many cases that need peaceful resolution in a public courtroom by a jury of our peers. The harsh procedural rules are barring claims, not on their merits, but on'the basis of arbitrary procedural traps. It is inconceivable that any medical malpractice or tort crisis is remedied by a *265 process that eliminates cases with little or no consideration to their merits. See, e.g., University of Miami v. Bogorff, 583 So.2d 1000 (Fla.1991) (limitations period began to run on medical malpractice action when parents noticed injury to child after treatment by physician, although they did not know at that time if injury was caused by negligence); Tanner v. Hartog, 593 So.2d 249 (Fla. 2d DCA 1992) (two-year limitations period expired on parents who knew or should have known of incident when they became aware that child died in útero during mother’s confinement in hospital); Goodlet v. Steckler, 586 So.2d 74 (Fla. 2d DCA 1991) (two-year statute of limitations began to run when treating physician informed mother of her daughter’s death); Jackson v. Georgopolous, 552 So.2d 215 (Fla. 2d DCA 1989) (statute of limitations barred medical malpractice action filed more than two years after plaintiff, with due diligence, could have determined that medical terminology used in death certificate meant that cause of death was attributable to toxic infection following surgery performed by defendant).
Judge Parker succinctly summarized the theme of the legislative “solution” to malpractice in his specially concurring opinion in Rogers v. Ruiz, 594 So.2d 756 (Fla. 2d DCA 1991):
The message in [Bogorff] is clear. Once the body is in the ground or once an adverse result occurs from a medical procedure, a grieving family member or dissatisfied patient, in order to protect a possible and unknown right to damages, should retain an attorney immediately and start subpoenaing medical records. This, to me, is a further wedge driven between formerly trusting relationships involving hospitals, doctors, patients, and attorneys.
Id. at 772 (Parker, J., concurring specially). It may be that the legislature did not intend these procedures to function as a trap for claimants, but it seems equally clear they have become just that. See Zacker v. Croft, 609 So.2d 140 (Fla. 4th DCA 1992).
If the common law system has been adding unnecessary expense to our health care system, the solution is not found in procedures which force our judiciary to appear unjust. We cannot mend our health care system by destroying our judicial system. Neither can it be fixed at the expense of such basic constitutional rights as trial by jury and access to courts.
Traditionally, common law judges have gradually modified standards of care and recoverable tort damages in response to changes in our social and economic structures. While this process is slow and perhaps overly conservative from the perspective of doctors working in a fast-changing, technological profession, it is a time-tested methodology. The legislature should understand that broad tort reform acts — especially laws that create rigid and complex procedures, that specify standards of care and that expressly enumerate the recoverable damages — tend to shift power traditionally vested in common law judges and place that power in the legislature.
Tort law needs flexibility in the individual case and over the span of time. Each citizen needs to have his or her unique case heard by a court that can adjust to the special needs of that case. The legislature meets for only a few weeks each year. It has neither the time nor the structure to make essential, case-specific refinements in tort law. The legislature may well have the constitutional ability to take many common law powers from the judiciary. However, it should consider whether the balance of constitutional power is helped or harmed when inflexible statutes take away the judiciary’s power to fairly and practically handle tort disputes between our doctors and their patients.
I would certify to the supreme court the following question as a matter of great public importance:
WHETHER THE REQUIREMENT IN A MEDICAL MALPRACTICE ACTION THAT NOTICE BE GIVEN BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, IS (1) A SUBSTANTIVE ELEMENT OF THE STATUTORY TORT, OR (2) A PROCEDURAL REQUIREMENT THAT CAN BE DISREGARDED BY THE TRIAL COURT WHEN THE *266 DEFENDANT RECEIVES ACTUAL WRITTEN NOTICE IN A TIMELY MANNER THAT RESULTS IN NO PREJUDICE.

. In the trial court and in this court, the parties rely upon chapter 766, Florida Statutes. Apparently, the Patrys’ claim accrued prior to the effective date of chapter 766, see ch. 88-277, § 51, Laws of Fla.; therefore, that chapter is not applicable to this action.

. It is noteworthy that the service of the notice of intent is probably sufficient to satisfy the service required under section 48.081, Florida Statutes (1989), as to Dr. Capps’ professional association. Thus, we are dismissing with prejudice a lawsuit against the professional association even though the notice as to that entity was "served” with the same formality used for actual summons and complaints.