618 So.2d 177 (1993)
Phyllis Kaye TANNER, etc., et al., Petitioners,
v.
Ellie HARTOG, M.D., et al., Respondents.
No. 79390.
Supreme Court of Florida.
May 13, 1993.
Kennan George Dandar, Dandar & Dandar, P.A., Tampa, for petitioners.
Philip D. Parrish and Robert M. Klein, Stephens, Lynn, Klein & McNicholas, P.A., Miami, for respondent Ellie M. Hartog.
Jerry L. Newman, Marilyn Drivas and Thomas M. Hoeler, Shear, Newman, Hahn *178 & Rosenkranz, P.A., Tampa, for respondent Alberto DuBoy.
Kevin C. Knowlton and Stephen R. Senn, Peterson, Myers, Craig, Crews, Brandon & Puterbaugh, P.A., Lakeland, for respondent Lakeland Regional Medical Center, Inc.
Marguerite H. Davis, Katz, Kutter, Haigler, Alderman, Davis, Marks & Rutledge, P.A., Tallahassee, for amicus curiae Fla. Defense Lawyers Ass'n.
Joel D. Eaton and Joel S. Perwin, Podhurst, Orseck, Josefsberg, Eaton, Meadow, Olin & Perwin, P.A., Miami, for amicus curiae Academy of Florida Trial Lawyers.
GRIMES, Justice.
We review Tanner v. Hartog, 593 So.2d 249 (Fla. 2d DCA 1992), in which the court certified the following as a question of great public importance:
WHETHER, AS A MATTER OF LAW, THE STILLBIRTH OF A CHILD IS SUCH AN OBVIOUS INJURY AS TO PLACE A PLAINTIFF ON NOTICE OF THE POSSIBLE INVASION OF THE PLAINTIFF'S LEGAL RIGHTS TO COMMENCE THE LIMITATIONS PERIOD UNDER SECTION 95.11(4)(b), FLORIDA STATUTES (1989).
17 Fla. L. Weekly D433 (Fla. 2d DCA Jan. 31, 1992).[1] We have jurisdiction under article V, section 3(b)(4) of the Florida Constitution.
Mr. and Mrs. Tanner filed a medical malpractice action against Dr. Hartog, Dr. Duboy, and Lakeland Regional Medical Center (health-care providers) arising out of the birth of their stillborn child. According to the complaint, the doctors examined Mrs. Tanner on March 31, 1988, and then sent her to the hospital for testing. The following morning the baby was delivered stillborn at the hospital. The complaint alleged that in light of the testing and Mrs. Tanner's condition, the doctors and the medical staff at the hospital were negligent in failing to promptly perform a delivery by caesarean section at a time when the child could have been saved. The complaint alleged that the Tanners neither knew nor should have known "that the actions and inactions of the defendants fell below the standard of care recognized in the community" until December 29, 1989.
The notice of intent to initiate medical malpractice litigation required by section 766.106, Florida Statutes (1987), was filed on February 12, 1990. The malpractice suit was filed on August 1, 1990. Upon motion of the health-care providers, the trial court dismissed the complaint as barred under the two-year statute of limitations. Section 95.11(4)(b), Fla. Stat. (1987). The district court of appeal affirmed the dismissal upon the rationale that the statute of limitations began running when the Tanners became aware of the stillbirth on April 1, 1988.
The pivotal issue in this case is when the statute of limitations began to run. The Tanners argue that it did not begin to run until December 29, 1989, which was alleged in the complaint to be the date that they first realized that the stillbirth was caused by medical negligence. The health-care providers assert that the statute began to run on April 1, 1988, because on that date the Tanners clearly knew that the injury had occurred.
Ideally, the question could be answered by reference to the statute itself. However, the statutes of limitation applicable to medical malpractice have never been clear on the subject, and courts have often been called upon to construe them. The current statute, which read the same when the Tanners had their stillborn child, is no exception:
(b) An action for medical malpractice shall be commenced within 2 years from the time the incident giving rise to the action occurred or within 2 years from the time the incident is discovered, or should have been discovered with the exercise of due diligence... .
*179 Section 95.11(4)(b), Fla. Stat. (1991).[2]
The health-care providers rely heavily upon the principle announced in Nardone v. Reynolds, 333 So.2d 25 (Fla. 1976), and applied in Barron v. Shapiro, 565 So.2d 1319 (Fla. 1990), and University of Miami v. Bogorff, 583 So.2d 1000 (Fla. 1991), which principle we shall refer to as the Nardone rule. In Nardone, a boy had undergone several brain operations and other procedures in early 1965. By the time he was discharged in July of that year, he was blind and comatose and had suffered irreversible brain damage. A malpractice action was filed in May of 1971. The physicians and hospital defended on the ground that the suit had not been filed within the applicable four-year statute of limitations. In the course of answering questions certified to us by the Fifth Circuit Court of Appeals, we stated:
Appellants request that this Court adopt the view that the statute of limitations did not commence to run until they became aware of the negligence of the physicians and hospital. Previously, this Court has held that the statute of limitations in a malpractice suit commences either when the plaintiff has notice of the negligent act giving rise to the cause of action or when the plaintiff has notice of the physical injury which is the consequence of the negligent act. City of Miami v. Brooks, 70 So.2d 306 (Fla. 1954). Sub judice, the plaintiffs were on actual notice of the decerebrate state of their son, that he had suffered irreversible brain damage, and in accordance with Brooks, supra, the statute of limitations began to run when the injury was known.
Nardone, 333 So.2d at 32 (emphasis added).
In Barron, 565 So.2d 1319, we reaffirmed the principle of Nardone that the statute begins to run when the plaintiffs knew or should have known that either the injury or the negligence had occurred. We recognized that a new statute of limitations applicable to malpractice had been enacted,[3] but we reasoned that the language was not sufficiently explicit to dictate a contrary result. In Barron, the patient had undergone an operation for removal of malignant polyps in his colon on August 17, 1979. Following surgery, he developed a serious infection. He was transferred into the hands of other physicians and the infection was finally brought under control by medication. However, the patient's eyesight began to deteriorate in October of 1979, and by December 31, 1979, he was diagnosed as blind. In January of 1982, the patient obtained a medical opinion that his blindness was caused by the negligence of his treating physician. The patient and his wife filed a malpractice action a few days later. We concluded that the plaintiffs were on notice of the injury by at least December 31, 1979, when the blindness was confirmed. Thus, pursuant to Nardone, we held that the applicable statute of limitations, which was then two years, had run prior to the filing of the malpractice action.
We addressed the issue once again in Bogorff, 583 So.2d 1000. There, a three-year-old boy had been suffering from leukemia but was in remission in July of 1971. In order to maintain the remission, the doctor began treating him with doses of methotrexate. In February of the following year, the boy's condition worsened, and three months later he lapsed into a coma. By July of 1972, he was a quadriplegic and severely brain damaged. During the next few years, his parents took the boy to a series of physicians. In 1982 they learned for the first time that the administration of methotrexate had been negligently accomplished, and they filed a malpractice action in December of that year. The district court of appeal held that the limitations period had not expired because the statute required that the parents have knowledge of both the physical injury and the negligent act which caused the injury before the *180 statutory period could begin to run. We pointed out that this was an inaccurate statement of the law and reaffirmed the principle that the triggering event for the limitation period was when the plaintiff should have known of either the injury or the negligent act. However, because there were allegations of fraudulent concealment, the case was ultimately decided on the basis that the suit was barred by the statute of repose.
On the other hand, the Tanners point to Ash v. Stella, 457 So.2d 1377 (Fla. 1984), Florida Patient's Compensation Fund v. Tillman, 487 So.2d 1032 (Fla. 1986), and Florida Patient's Compensation Fund v. Cohen, 488 So.2d 56 (Fla. 1986), each of which are at least susceptible to the interpretation that the malpractice statute of limitations does not begin to run until there is knowledge of all the elements of a completed tort, including the negligent act, the injury, and the causal connection between the two.
However, the Tanners most strongly rely upon this Court's decision in Moore v. Morris, 475 So.2d 666 (Fla. 1985). In that case, after the mother commenced labor the husband was advised that there was an emergency and that the baby would be taken by caesarean section. After the infant was born, she was "blue," and a tube was ultimately inserted in her chest to assist in breathing. However, the baby physically appeared to make a speedy and complete recovery, and the parents were repeatedly told by their physicians that she was fine. It was only after the child became three years old that she was diagnosed as having brain damage. The issue before the Court was whether the statute of limitations began to run upon the date of the birth or when the diagnosis of brain damage was made. In reversing a summary judgment for the defendants, we held that there was evidence in the record which would tend to prove that the Moores were not on notice of either the negligent act or the injury at the time of the infant's birth, emphasizing that until the parents received the adverse diagnosis, they had been consistently told that the child was healthy. However, Moore may arguably stand for the proposition that mere knowledge of the adverse result, standing alone, does not necessarily trigger the running of the statute of limitations.
In an effort to avoid what was perceived as a harsh result in some cases, the district courts of appeal have been reluctant to strictly apply the Nardone rule. Thus, in Menendez v. Public Health Trust, 566 So.2d 279, 282 n. 3 (Fla. 3d DCA 1990), approved, 584 So.2d 567 (Fla. 1991), the court said that "[a] defect at birth does not necessarily put the parents on notice of injury or of possible negligence." In Southern Neurosurgical Associates v. Fine, 591 So.2d 252, 256 (Fla. 4th DCA 1991), the court held that "knowledge that one suffered injury during or subsequent to an operation, which could be supposed to have arisen out of natural causes, need not constitute notice of negligence or injury caused by negligence." More recently, in Norsworthy v. Holmes Regional Medical Center, Inc., 598 So.2d 105, 107 (Fla. 5th DCA 1992), the court said:
Perhaps we read Bogorff and Barron too optimistically, but we believe those cases simply stand for the proposition that when the nature of the bodily damage that occurs during medical treatment is such that, in and of itself, it communicates the possibility of medical negligence, then the statute of limitations begins to run. On the other hand, if there is nothing about an injury that would communicate to a reasonable lay person that the injury is more likely a result of some failure of medical care than a natural occurrence that can arise in the absence of medical negligence, the knowledge of the injury itself does not necessarily trigger the running of the statute of limitations.
Even the Second District Court of Appeal, which rendered the decision below, has had some misgivings. In Rogers v. Ruiz, 594 So.2d 756 (Fla. 2d DCA 1991), the panel split three ways. Judge Lehan, writing for the majority, concluded that because of Barron and Bogorff, knowledge of a death which occurred during risky heart surgery constituted notice of the "incident" *181 of malpractice as a matter of law, notwithstanding that death was a statistically predictable consequence of nonnegligently performed surgery. In his partial dissent, Judge Ryder reasoned that notice of more than mere injury was needed for the statute of limitations to begin to run. Judge Parker reluctantly concurred with the majority, but made the following pointed remarks:
It is my belief that Bogorff rips at the very fabric of our society. The message in that case is clear. Once the body is in the ground or once an adverse result occurs from a medical procedure, a grieving family member or dissatisfied patient, in order to protect a possible and unknown right to damages, should retain an attorney immediately and start subpoenaing medical records. This, to me, is a further wedge driven between formerly trusting relationships involving hospitals, doctors, patients, and attorneys. The message is clear. If one thinks anything adverse possibly could have happened to him or her or to a loved one while undergoing medical care, one immediately must demand all medical records and retain an expert to review those records and to advise the patient or family. This appears to be the only prudent way to proceed to avoid the statute of limitations' window closing upon an action for medical malpractice, even when the family or patient has nothing tangible which would indicate to a lay person that malpractice has occurred.
Rogers, 594 So.2d at 772 (Parker, J., concurring).
It should also be noted that the decision below was not unanimous. Judge Patterson's opinion states:
I respectfully dissent. I am disturbed by the trend in this area of the law which creates a fiction that a normal, but unfortunate, incident of proper medical care and treatment in the eyes of a lay person is in fact legal notice of possible malpractice. In my view, the legislature recognized such circumstances when it included the "should have been discovered with the exercise of due diligence" language in section 95.11(4)(b), Florida Statutes (1989). A party litigant should be given the opportunity to establish by competent evidence that they fall within circumstances defined by the legislature to protect unwary and uneducated persons from the harsh consequences of their ignorance of the pitfalls of medical treatment.
Tanner v. Hartog, 593 So.2d at 253 (Patterson, J., dissenting).
Particularly because Barron and Bogorff represent our most recent expressions on the subject, we cannot fault the court below for scrupulously applying the Nardone rule. However, there is legitimate concern that when this rule is strictly applied to the facts of some cases, it may not produce just or even reasonable results. This is particularly true in those cases in which the adverse consequence of which the claimant has knowledge often occurs as a result of natural causes rather than from medical negligence. The Nardone rule tends to put a strain on the doctor-patient relationship because whenever something bad happens in the course of medical treatment, the patient must make an early investigation of the possibility of malpractice lest the statute of limitations expire.
As a consequence, we have determined to place an interpretation on the Nardone rule designed to ameliorate the harsh results which can sometimes occur by its strict application. We hold that the knowledge of the injury as referred to in the rule as triggering the statute of limitations means not only knowledge of the injury but also knowledge that there is a reasonable possibility[4] that the injury was caused by medical malpractice. The nature of the injury, standing alone, may be such that it communicates the possibility of medical negligence, in which event the statute *182 of limitations will immediately begin to run upon discovery of the injury itself. On the other hand, if the injury is such that it is likely to have occurred from natural causes, the statute will not begin to run until such time as there is reason to believe that medical malpractice may possibly have occurred.
We recognize that our holding will make it harder to decide as a matter of law when the statute begins to run and may often require a fact-finder to make that determination. We note, however, that by virtue of our recent decision in Kush v. Lloyd, 616 So.2d 415 (Fla. 1992), the statute of repose requires that suit be brought in any event within four years of the date the medical negligence occurred, except in cases of fraudulent concealment. Because in most instances the date upon which the medical negligence occurred will be undisputed, the application of the statute of repose will generally be a matter of law.
For those who believe that our interpretation of the Nardone rule constitutes a departure from stare decisis, the fact that in Kush we have now definitively placed an outer time limit beyond which medical malpractice actions may not be commenced can be viewed as a justification for such a departure. Further, though we have refined the analysis in Nardone, Barron, and Bogorff, we do not believe that the outcome of those cases would have been different under the interpretation we adopt today. In each case, the circumstances of the injury were such that as a consequence the claimant should have been put on notice of the reasonable possibility that negligence had occurred, thereby triggering the running of the statute of limitations.
Applying this rationale to the instant case, it cannot be said that the allegations of the complaint reflect that the statute of limitations had expired before suit was filed. Mere knowledge of a stillbirth, without more, would not suggest the possibility of medical negligence. The point at which the statute began to run can only be determined after the pertinent facts have been developed.
We also address the propriety of the computation employed by the court below in determining the date upon which the statute of limitations expired. It is unlikely that the resolution of this issue will affect the parties to this case in light of our disposition of the certified question. However, there appears to be disagreement in the courts with respect to how the computation should be made.
Chapter 766 provides two provisions for tolling the statute of limitations in medical malpractice actions. The first is section 766.104(2), Florida Statutes (1991), formerly section 768.495(2), which states:
(2) Upon petition to the clerk of the court where the suit will be filed and payment to the clerk of a filing fee, not to exceed $25, established by the chief judge, an automatic 90-day extension of the statute of limitations shall be granted to allow the reasonable investigation required by subsection (1). This period shall be in addition to other tolling periods. No court order is required for the extension to be effective. The provisions of this subsection shall not be deemed to revive a cause of action on which the statute of limitations has run.
This automatic extension is separate and additional to any other tolling period. Novitsky v. Hards, 589 So.2d 404 (Fla. 5th DCA 1991). The Tanners did not seek an extension under this statute.
The other provision is section 766.106(4), Florida Statutes (1991), which reads as follows:
(4) The notice of intent to initiate litigation shall be served within the time limits set forth in s. 95.11. However, during the 90-day period, the statute of limitations is tolled as to all potential defendants. Upon stipulation by the parties, the 90-day period may be extended and the statute of limitations is tolled during any such extension. Upon receiving notice of termination of negotiations in an extended period, the claimant shall have 60 days or the remainder of the period of the statute of limitations, whichever is greater, within which to file suit.
*183 Initially, we note that the statute could be construed as providing an additional sixty-day period only when the parties have stipulated to an extension of the ninety-day tolling period. In fact, this argument was raised and rejected in Rhoades v. Southwest Florida Regional Medical Center, 554 So.2d 1188 (Fla. 2d DCA 1989), relied on by the court below. In Rhoades, a notice of intent to initiate litigation was served on January 4, 1988, the day before the statute of limitations was to expire. The claim was not resolved, and the appellant filed his medical malpractice action on May 23, 1988. The trial court dismissed the suit against that defendant on the theory that the additional sixty days specified in section 768.57(4), Florida Statutes (1987),[5] was only applicable when the parties had stipulated to an extension of the ninety-day tolling period. In rejecting this construction of the statute, the district court observed:
As to the appellee who was served notice of intent to initiate litigation on January 4, 1988, the appellant would have had one day to file his complaint after the expiration of the 90-day tolling period. This approach would discourage parties from continuing their attempts to settle a claim and would frustrate the legislative intent underlying these provisions. In turn, the potential benefit to the public would be diminished. Any uncertainty as to legislative intent should be resolved by an interpretation that best accords with the public interest. Sunshine State News Co. v. State, 121 So.2d 705, 708 (Fla. 3d DCA 1960).
Rhoades, 554 So.2d at 1190-91. The court went on to hold that upon the expiration of either the ninety-day tolling period or a stipulated extension of that time the claimant had sixty days or the remainder of the period of the statute of limitations within which to file suit. Hence, the complaint was timely filed on May 23, 1988. Accord Novitsky, 589 So.2d 404. We believe that the court was correct in rejecting the argument that the "sixty days or remainder" language of the statute should be construed so narrowly. Finding the "sixty days or remainder" language to be applicable even where no mutual extension of the ninety-day tolling is present, the question then becomes how this extra time should be added to the limitations period.
In this case, if we assume the statute of limitations began to run on April 1, 1988, the date of the stillbirth, the statute was set to expire on April 1, 1990. The Tanners filed their notice of intent to litigate on February 12, 1990. Under their interpretation of section 766.106(4), this filing extended the two-year limitations period by ninety days to June 30, 1990. Then, under the Tanners' theory, the statute further extended the limitations period for an additional sixty days, to August 29, 1990, making their complaint timely filed on August 1, 1990.
The health-care providers, on the other hand, argue that the district court of appeal correctly calculated the expiration of the limitations period. This calculation was as follows:
[T]he statute of limitations commenced running when the appellants were aware of the stillbirth on April 1, 1988. On February 12, 1990, 47 days prior to the running of the limitations period, the appellants tolled the statute 90 days by filing a notice of intent to initiate medical malpractice litigation pursuant to section 766.104, Florida Statutes. Thereafter, the appellants were entitled to file suit within 90 days plus the greater of either the remainder of the statute of limitations (47 days) or 60 days. Since there were fewer than 60 days remaining on the statute of limitations when the notice of intent letters were mailed, the appellants had 150 days (90 plus 60) from February 12, 1990, or until July 12, 1990, to file suit.
Tanner, 593 So.2d at 252-53 (citation omitted).
We approve of the method employed by the court below in determining when the limitations period would expire. From the date the notice of intent is filed, the plaintiff has ninety days (the amount of the *184 tolling) plus either sixty days or the time that was remaining in the limitations period, whichever is greater, to file suit. We believe the language of section 766.106(4) was intended to provide extra time to a plaintiff who files a notice of intent shortly before the limitations period expires. This permits the plaintiff to have the full ninety days in which to try to negotiate a settlement and provides an additional sixty days to file a complaint if a settlement cannot be accomplished. However, the time remaining must be computed from the date the notice of intent was filed, rather than simply adding on the extra time to the end of the limitations period, so as to implement the intent of the statute and avoid an unreasonable windfall to the plaintiff who files a notice of intent soon after the malpractice is discovered.[6]
We answer the certified question in the negative. We do not reach the Tanners' third point which pertains to the trial court's order that the complaint also failed to state a cause of action. In view of our answer to the certified question, the district court of appeal should now address that issue. Thus, we quash the decision below to the extent that it is inconsistent with this opinion and remand the case for further proceedings.
It is so ordered.
OVERTON and HARDING, JJ., concur.
McDONALD, J., concurs with an opinion.
BARKETT, C.J., concurs specially with an opinion.
KOGAN, J., concurs with an opinion, in which BARKETT, C.J., concurs.
SHAW, J., concurs in result only.
McDONALD, Justice, concurring.
Although I may disagree in part with the nomenclature employed by the majority to reach its conclusion, I concur. I agree fully with its discussion of the provisions of chapter 766.
A cause of action arises when there is a wrong and an injury. Ignorance of the wrong does not delay the commencement of a statute of limitation. It may, however, affect what statute of limitation applies. This is the situation in reference to a medical malpractice claim. Some meaning must be afforded that part of section 95.11(4)(b), Fla. Stat. (1987), which reads "or within two years from the time the incident is discovered, or should have been discovered with the exercise of due diligence... ." To make sense this should be interpreted to grant a medical malpractice claimant two years from the time he or she discovers that the injury the claimant received was caused by some wrong of the medical provider to commence an action. This time is further limited in the statute to four years from the medical procedure causing the injury by the provision "however, in no event shall the action be commenced later than four years from the date of the incident or occurrence out of which the cause of action accrued."
The majority accommodates this view and I thus concur.
BARKETT, Chief Justice, concurring specially.
I certainly concur with that portion of the opinion that recedes from Nardone v. Reynolds, 333 So.2d 25 (Fla. 1976), Barron v. Shapiro, 565 So.2d 1319 (Fla. 1990), and University of Miami v. Bogorff, 583 So.2d 1000 (Fla. 1991).
I adhere to the views I expressed in my separate opinion in Kush v. Lloyd, 616 So.2d 415 (Fla. 1992).
*185 KOGAN, Justice, concurring.
Like Justice McDonald, I find some of the wording in the majority opinion troublesome, in particular the use of the term "possibility." Majority op., at 181 & 181 n. 4. Some may view every untoward medical event or injury as suggesting the possibility of malpractice, which is the very rationale upon which Nardone was based. If so construed, however, the majority opinion would not make sense because Nardone would not have been ameliorated in the slightest, contrary to the majority's stated intent. Id. at 11. Likewise, the majority does not expressly define the word "knowledge" when it speaks of "knowledge that there is a reasonable possibility" of malpractice.
I believe that trial and district courts relying upon the majority's language would do well to place their emphasis on the following comments of the majority:
[I]f the injury is such that it is likely to have occurred from natural causes, the statute will not begin to run until such time as there is reason to believe that medical malpractice may possibly have occurred.
Id. at 181-182. Earlier, the majority makes the following comment illuminating this same point:
[T]here is legitimate concern that when [the Nardone] rule is strictly applied to the facts of some cases, it may not produce just or even reasonable results. This is particularly true in those cases in which the adverse consequence of which the claimant has knowledge often occurs as a result of natural causes rather than from medical negligence.
Id. at 181.
Taken together, these comments lead to two conclusions: (1) a "possibility" of negligence does not exist if the untoward medical event reasonably appeared likely to have been the product of an agency other than malpractice, such as "natural causes"; and (2) "knowledge" about this possibility is viewed from the perspective of the actual plaintiffs, not from the perspective of persons with training or skills different from the plaintiffs. Accordingly the trial court in confronting this issue must make an inquiry into the facts actually known to the plaintiffs and their level of knowledge, education, and awareness of medical practice and of what is likely to constitute a negligent act. There also must be an inquiry into what the medical provider or providers actually told the plaintiffs about the untoward event, if anything.
Where plaintiffs have little or no special expertise and were told that the untoward event was "natural" or non-negligent, then I can envision only a few extraordinary situations in which the statute will begin to run on the date of the event itself.[7] This in part embodies an estoppel concept: Medical providers or their agents who convince patients that an untoward medical event was "natural" and non-negligent will rarely be permitted to deny that same representation in court for purposes of statutes of limitation.
Even where medical providers avoid making any such representations, however, the court still must look at the issue from the perspective of the actual plaintiffs, in light of their training and skill. The present case is a classic illustration of the point: Stillbirths like the one at issue here can be and often are an entirely natural event, a *186 known and substantial risk every parent encounters during a pregnancy. We have no indication that anything occurred that obviously would have put the parents on notice of possible malpractice at that time  for example, the parents in the moments following the stillbirth were told by a physician that a caesarean should have been performed, or one of the parents was a physician who had reviewed the medical test records and was capable of understanding their import. Likewise, we have no indication that the parents possessed other training or skills that might have led them to suspect a likelihood of negligence based on the facts before them at the time of the stillbirth.[8]
The courts below erred because they applied a per se rule of reversal based on their belief that the date of the stillbirth always would be the starting point for the statute of limitation. That is not necessarily so. Thus, the cause of action should not have been dismissed.
BARKETT, C.J., concurs.
NOTES
[1] The certified question was inadvertently omitted from the Southern Reporter.
[2] We note that the 1992 legislature declined to enact proposed legislation which would have amended section 95.11(4)(b) to provide that knowledge of the injury without knowledge that the injury resulted from malpractice does not constitute discovery of the incident. Fla. CS for HB 625 (1992); Fla. CS for SB 784 (1992).
[3] The pertinent part of the statute construed in Barron is the same as the current statute.
[4] We decline the suggestion that the statute should not begin to run until there is notice of a "probability" of medical malpractice. To do so would make the reference to "knowledge of the negligent act" in the Nardone rule redundant and would result in an inordinate extension of the statute.
[5] That statute has now been renumbered as section 766.106(4), Florida Statutes (1991).
[6] The weakness in the Tanners' position is exemplified in a hypothetical which assumes that they had filed their notice of intent on May 1, 1988, one month after the limitations period commenced. Under the Tanners' theory, they would then have had ninety days tacked on to April 1, 1990, plus the greater of either the time remaining when the notice was filed (twenty-three months) or sixty days. Thus, they would have had until May 30, 1992, to file this claim, or over four years after discovery of the incident. This could not have been what the legislature intended and would be contrary to the plain language of the statute providing that upon termination of negotiations the claimant shall have sixty days or the remainder of the limitations period, whichever is greater, within which to file suit.
[7] There may be medical injuries so extraordinary that it would be unreasonable for anyone to think they were anything other than a possible malpractice, no matter what medical personnel have said. For example, when patients have actual knowledge that sponges have been left inside their bodies during surgery, it clearly would be unreasonable to think the event anything other than a possible malpractice. However, the patients would not be on notice of a possible malpractice if the sponges have remained undiscovered, the patients have no knowledge of their locations, and the patients reasonably believe that the swelling and discomfort being caused by the sponges are a routine consequence of surgery. This last conclusion would only be reinforced if medical personnel have reassured the patients that the swelling and discomfort are a normal aftereffect.
[8] Of course, there may be facts now rendered relevant by the opinion in this case that were not developed below, and it is possible that either party could prevail depending on the nature of those facts. The parties should be allowed to develop those facts on remand without prejudice.