GRIFFIN, C.J.
This is the appeal of an order dismissing a medical malpratice action based on the applicable two-year statute of limitations.[1] Because the statute of limitations had not expired as a matter of law on the date suit was filed, we reverse.
On August 13, 1993, fifty-eight year old William Cunningham injured his back at work while lifting furniture. He was treated at the local health clinic. Four days later, Mr. Cunningham sought treatment from Dr. Mary Ann Tessalona because of continued complaints of back pain. Dr. Tessalona decided at that time that he should be admitted to Putnam Community Hospital. During this office visit, Mr. Cunningham complained of chest pressure, abdominal pain, back pain, chills, sweats, shortness of breath, nausea, vomiting, frequency of urination and fever of 102.8!
In the hospital chart for the August 17, 1993 admission, Dr. Tessalona’s history and physical indicated Mr. Cunningham had suffered lower back pain since the preceding Friday when he injured his back. Her impression at that time was:
1. Unstable angina; rule out myocardial infarction;
2. Uncontrolled diabetes mellitus, rule out diabetic ketoacidosis;
3. Febrile illness of uncertain etiology, rule out diverticulitis or renal calculi;
4. History of hypertension;
5. History of cardiomegaly.
Prior to discharge on August 24, 1993, x-rays were taken of the lumbar spine. These x-rays were read by Dr. John Soong, a radiologist. He noted hypertrophic osteophyte formation, but no bony defects or displacement were noted. No x-rays were taken of the thoracic spine. In addition, a blood culture laboratory report dated August 20,1993, indicated staphylococcus (coagulase positive), but at the time of discharge on August 24, 1993, the organism had not yet been identified.
After his release, as a result of his continuing back pain, Mr. Cunningham returned to the health clinic at Putnam Community Hospital on at least three additional occasions. Each time the diagnosis was back sprain. Mr. Cunningham also continued to seek treatment from Dr. Tessalona during this time period.
*177 When Mr. Cunningham failed to improve, Mrs. Cunningham called the workers’ compensation carrier and asked if her husband could see a different doctor. Jane Weeks, the worker’s compensation carrier’s representative, sent them to Dr. Lowery, an ortho-paedic surgeon in Gainesville, whose clinic is called the Florida Neck and.Back Institute, Inc.
On October 6, 1993, Mr. Cunningham was seen by Dr. Lowery’s office staff for purposes of pre-screen patient history. On that date, Mr. Cunningham complained his back pain was so bad that he had to crawl to the bathroom every morning and run hot water over his back before he could even use the toilet. He further complained that he had not worked at all since August 13, 1993. He also complained that he could not sit up long enough to eat, could not stand up straight because the pain was so severe and could not walk more than a few paces at.a time. He was unable to perform their range of motion testing because of the pain. Mr. Cunningham also complained of abdominal pain and weight loss. X-rays were taken of Mr. Cunningham’s spine.
Mr. Cunningham was seen by Dr. Lowery on October 11, 1993. At the same timé, Dr. Lowery reviewed the previous MRI scans, as well as the x-rays taken on October 6, 1993. His interpretation of the latter x-rays was that they revealed traction osteophytes at multiple levels as well as degeneration of the L4/5 level without significant instability or spondylolisthesis. In essence, Dr. Lowery felt the MRI scans and x-rays demonstrated no abnormality in the disks. Dr. Lowery felt he had a myofascial back injury but didn’t know if Mr. Cunningham was “overplaying” the situation. Because Mr. Cunningham had had no therapy yet, he ordered conservative treatment consisting of aggressive physical therapy. He referred Mr. Cunningham to Dr. Oscar DePaz for that purpose.-
When Mr. Cunningham saw Dr. DePaz approximately one month later on November 8, 1993, he related continuing complaints of lower and center back pain as well as in the hips and electrical jolts following coughs and sneezes. Mrs. Cunningham indicated her husband had lost approximately seventy pounds in the last three months and also suffered fevers, chills, night sweats and that she had to change his clothes several times at night secondary to his drenching the bed. Mrs. Cunningham also noted that ■ he had suffered a fever up to 102° on several occasions in the last several months.. Mr. Cunningham additionally relayed numbness of the right leg.
Mrs. Cunningham testified that Dr. DePaz told Mr. Cunningham that something else was wrong with him besides a sprained back and ordered a bone scan which was performed November 15,1993, at North Florida Regional Medical Center. The bone scan showed increased uptake in the T11/T12 area indicating á prominent compression fracture with obliteration of the disc space and some mild sclerosis and moderate angulation ky-phosis in the area approximately at 30 degrees. Dr. DePaz sent Mr. Cunningham back to Dr. Lowery for evaluation and surgical intervention.
X-rays were taken by Dr. Lowery which showed destruction of T11/T12 interspace with compression of the anterior wedge. Dr. Lowery’s impression was to rule out malignancy versus infection. .He immediately admitted Mr. Cunningham to North Florida Regional Medical Center.
- A CT guided needle biopsy was performed on November 16,1993,'which showed staphylococcus aureus, and Mr. Cunningham was started on intravenous antibiotics. On November 23, 1993, Dr. Lowery performed a surgical decompression of Mr. Cunningham’s spine at TIO, Til and T12.' Post-operatively, Mr. Cunningham developed complete paraplegia. Dr. Lowery planned on performing a posterior spinal fusion on January 5, 1994, to help stabilize the spine. However, on December 26, 1993, at approximately 10 a.m., Mr. Cunningham began complaining of feeling light-headed and started gasping. He was subsequently pronounced dead at 10:26 a.m. The death certificate indicates Mr. Cunningham died from a pulmonary embolus.
On June 17, 1996, suit was filed against all involved providers. Subsequently, settlements were reached and the claims dismissed against all except Dr. Lowery and his Florida *178 Neck and Back Institute, P.A. These defendants sought summary judgment, contending that the statute of limitations had expired no later than February 13, 1996, two years plus ninety days from the date the results of the needle biopsy were known, thus making the service of the notice of intent tardy by fourteen days. The lower court entered summary judgment in defendants’ favor.
The controlling statute is section 95.11(4)(b), Florida Statutes, which provides:
(b) An action for medical malpractice shall be commenced within 2 years from the time the incident giving rise to the action occurred or within 2 years from the time the incident is discovered, or should have been discovered with the exercise of due diligence; however, in no event shall the action be commenced later than 4 years from the date of the incident or occurrence out of which the cause of action accrued. An “action for medical malpractice” is defined as a claim in tort or in contract for damages because of the death, injury, or monetary loss to any person arising out of any medical, dental, or surgical diagnosis, treatment, or care by any provider of health care. The limitation of actions within this subsection shall be limited to the health care provider and persons in privity with the provider of health care. In those actions covered by this paragraph in which it can be shown that fraud, concealment, or intentional misrepresentation of fact prevented the discovery of the injury within the four-year period, the period of limitations is extended forward 2 years from the time that the injury is discovered or should have been discovered with the exercise of due diligence, but in no event to exceed 7 years from the date the incident giving x'ise to the injury occurred.
§ 95.11(4)(b), Florida Statutes 1995. This statute is not very clear, as the high court noted in Tanner v. Hartog, 618 So.2d 177, 178 (Fla.1993). In this case, application of the statutory language is even more problematical because the alleged malpractice is not an “incident;” rather it involves the ongoing failure to correctly diagnose Mr. Cunningham’s illness, to order appropriate tests and to undertake appropriate treatment.
In Tanner, the question was whether the mere stillbirth of a child triggered the statute of limitations or whether a plaintiff parent must actually have reason to believe that medical malpractice may possibly have occurred. The court ruled that because the injury itself (stillbirth) does not suggest malpractice, the statute did not begin to run until some time later. Id. at 179.
To state the question posed by this case in terms of Tanner would be to ask whether the state of Mrs. Cunningham’s knowledge prior to November 30, 1993 was sufficient to put her on notice that her husband had suffered an injury and that there was a reasonable possibility that the injury was caused by medical malpractice. Id. at 177. In explaining the statutory test, the Tanner court said:
The nature of the injury, standing alone, may be such that it communicates the possibility of medical negligence, in which event the statute of limitations will immediately begin to run upon discovery of the injury itself. On the other hand, if the injury is such that it is likely to have occurred from natural causes, the statute will not begin to run until such time as there is reason to believe that medical malpractice may possibly have occurred.
Tanner v. Hartog, 618 So.2d at 181-82.
The appellees’ position is both narrow and straightforward. They rely solely on the deposition testimony of Mrs. Cunningham for the proposition that, as of November 16, 1993, the date of the needle biopsy which showed the staph infection, Mrs. Cunningham knew that there was a reasonable possibility that Dr. Lowery had injured her husband through malpractice. Therefore, as a matter of law, Dr. Lowery was entitled to summary judgment. It is accurate to say that Mrs. Cunningham learned on November ,16, 1993 that her husband’s true condition had not previously been diagnosed, but that is not the same thing as knowledge that there was a reasonable possibility that her husband had been injured through the malpractice of Dr. Lowery. Mrs. Cunningham did not testify that Dr. Lowery gave her a specific diagnosis on the one occasion ho saw *179 her husband before the bone scan. More important, the making of a new diagnosis of disease does not suggest that the prior diagnosis was an act of professional negligence.
A review of the deposition testimony of Mrs. Cunningham shows that Mrs. Cunningham had no actual notice of an injury caused by 'a delay in diagnosis nor did anything she knew or was told put her on notice that the delay in diagnosis was possibly the result of negligence. As protective as Mrs. Cunningham was of her husband and as proactive as she showed herself to be in getting proper treatment for him, Mrs. Cunningham allowed Dr. Lowery to continue to treat her husband after' the infection was found and there is no suggestion that she had any awareness that his care was in any way deficient. She never questioned Dr. Lowery about his care until after her husband’s death. Mrs. Cunningham testified that Dr. Lowery told her when she went to see him after her husband’s death that “there is some things that you _that just can’t be explained.” She understood that to mean that the death was unpreventable. Dr. Lowery himself is adamant that his care was proper and he further suggests that had he acted differently on October 11,1993, it would not have mattered. Dr. Lowery also testified that he told Mrs. Cunningham after the infection was discovered that the infection and/or the fracture were not necessarily connected to the original injury.
We do not believe that the discovery of the infection on November 16, 1993 suggested that Dr. Lowery’s failure to diagnose the infection previously or to order additional tests when Dr. Lowery first saw Mr. Cunningham on October 11, 1993 was notice of malpractice as a matter of law. Identification of the infection did not “speak for itself.” As the Tanner court observed, it is hard to decide as a matter of law when the malpractice statute of limitations begins to run in any given ease, and very often it will require the fact-finder to make that determination. Id. at 182. See also Higgs v. Florida Dep’t of Corrections, 654 So.2d 624 (Fla. 1st DCA 1995), review denied, 659 So.2d 1086 (Fla.1995); ■ This is especially true of misdiagnosis or delay in diagnosis. .
The Florida supreme court did consider a misdiagnosis case in Ash v. Stella, 457 So.2d 1377 (Fla.1984). In Ash, the victim had begun experiencing back and shoulder pain in 1975. In 1977, she .came under the care of Dr. Ash who failed to diagnose cancer of the right post-scapula. The correct diagnosis was finally made on March 23,1977 but Mrs. Stella died on January 31,1978. The contention there was that the statute of limitations began to run on the date the correct diagnosis was communicated ■ to Mrs. Stella. The high court rejected this contention, saying:
Thus there is an issue of fact as to whether notice that an inoperable, malignant tumor had been discovered did, in fact; put the respondent and his wife on legal notice that the tumor had existed at the time Dr. Ash treated Mrs. Stella and that Dr. Ash had been negligent in improperly diagnosing the problem. The etiology of malignancy is not well enough understood, even by medical researchers, that the courts should impute sophisticated medical analysis to a lay person struggling to cope with the fact of malignancy. Further evidence may reveal that, without knowledge of the specific nature of the tumor, no medical expert could have conclusively stated that the cancer did, in fact, exist at the time of Dr. Ash’s alleged misdiagnosis. Absent a finding of fact that before March 30, 1977, medical records showed that the newly discovered tumor had been the cause of Mrs. Stella’s earlier problems, constructive knowledge of the incident giving rise to the claim cannot be charged to the Stellas.
Id., 457 So.2d at 1379 (emphasis in original).[2] Ash reiterates that courts should take care not to impute sophisticated medical analysis to a lay person struggling with the fact of a crippling or horrifying illness. Too great is the -faith laypersons place in their physicians for the law to impute a duty on them to investigate malpractice in every change in diagnosis or treatment.
*180 The concurring opinion of Justice Kogan in Tanner is also instructivo. Justice Kogan expressed the view that the majority’s “reasonable possibility of malpractice” test would be difficult to apply justly and reasonably. 618 So.2d at 184-85. He observed:
(1) [A] “possibility” of negligence does not exist if the untoward medical event reasonably appeared likely to have been the product of an agency other than malpractice, such as “natural causes”; and (2) “knowledge” about this possibility is viewed from the perspective of the actual plaintiffs, not from the perspective of persons with training or skills different from the plaintiffs. Accordingly the trial court in confronting this issue must make an inquiry into the facts actually known to the plaintiffs and them level of knowledge, education, and awareness of medical practice and of what is likely to constitute a negligent act. There also must be an inquiry into what the medical provider or providers actually told the plaintiffs about the untoward event, if anything.
Where plaintiffs have little or no special expertise and were told that the untoward event was “natural” of non-negligent, then I can envision only a few extraordinary situations in which the statute will begin to run on the date of the event itself. This in part embodies an estoppel concept: Medical providers or their agents who convince patients that an untoward medical event was “natural” and non-negligent will rarely be permitted to deny that same representation is correct for purposes of statutes of limitation. Even where medical providers avoid making any such representations, however, the court still must look at the issue from the perspective of the actual plaintiffs, in light of their training and skill.... [W]e have no indication that the [family] possessed other training or skills that might have led them to suspect a likelihood of negligence based on the facts before them....
Tanner, 618 So.2d at 185 (footnotes omitted).
Finally, the Tanner court quoted with apparent approval the following language in Judge Patterson’s dissent in Tanner v. Hartog, 593 So.2d at 249 (Fla. 2d DCA 1992):
I am disturbed by the trend in this area of the law which creates a fiction that a normal, but unfortunate, incident of proper medical care and treatment in the eyes of a lay person is in fact legal notice of possible malpractice. In my view, the legislature recognized-such circumstances when it included the “should have been discovered with the exercise of due diligence” language in section 95.119(4)(b), Florida Statues (1989). A party litigant should be given the opportunity to establish by competent evidence that they fall unthin circumstances defined by the legislature to protect unwary and uneducated persons from, the harsh consequences of their ignorance of the pitfalls of medical treatment.
Id., 593 So.2d at 253 (emphasis added).
Healing is an art and the concept of “reasonable care” by a physician in making a diagnosis is an especially complicated question. Diagnosis of illness or injury is a different process from treatment of a known injury. Patients and their families understand that the diagnosis is frequently a process which can be difficult and that the “trial and error” that may be involved in such a process does not necessarily suggest that the diagnosing physician’s performance was below the generally accepted standard of care of a profession about which they are ignorant. Although some acts of malpractice, and some injuries, do speak for themselves and will put even laypersons on notice of malpractice, a malpractice claim based on misdiagnosis will, in many cases, raise, at most, an issue of material fact concerning a plaintiff’s knowledge. Higgs, 654 So.2d at 627.
The case we have before us is not a case where the new diagnosis communicates a reasonable possibility of negligence. Indeed, after- having benefit of the entire record in this case, it is still unclear, at least to these three educated, but medically untrained laypersons, what Mr. Cunningham’s condition truly was at all stages of his illness after- his injury and what exactly was the mechanism of his death.
Additionally, based on the scenario in this case, and consistent with the above quoted views of Justice Kogan, it would seem that if *181 the law is to place on a layperson like Mrs. Cunningham the burden of appreciating malpractice at the moment she learned that her husband had an infection, then the law must by rights impose on the physician a concomitant duty of disclosure. If this diagnosis is deemed in law to have spoken the reasonable probability of malpractice to Mrs. Cunningham, it must truly have resonated in the ears of Dr. Lowery. Yet, every fact we can find concerning his actions during his care and treatment of Mr. Cunningham, his words and actions after Mr. Cunningham’s death and throughout the litigation belie the notion that the diagnosis of infection in November 1993 spoke to him the reasonable possibility of his professional negligence. It would be both fair and desirable in order for a physician to claim the benefit of the running of the statute of limitations in a misdiagnosis case from the moment of the correct diagnosis, that the physician who continues to treat the patient be required to disclose to the patient or the patient’s representative the fact of and the possible significance of the misdiagnosis. Had Dr. Lowery done so, the statute clearly would have begun to run from the moment of his disclosure.
In this case, however, Mrs. Cunningham, an ordinary person unschooled in medicine, was left to figure malpractice out for herself. In such a case, a jury should decide whether what she knew when the infection was diagnosed was enough to conclude that the statute of limitations had expired when the suit was filed.
REVERSED and REMANDED.
PETERSON and THOMPSON, JJ., concur.

. § 95.ll(4)(b), Florida Statutes (1995).

. The court referred to Ash in Tanner but does not expressly approve or disapprove it. 618 So.2d at 180.