BENTON, J.
Richard Allen Beck, an otolaryngologist, appeals the final judgment entered in the medical malpractice case Richard and Kim Holloway brought against him. We affirm the judgment insofar as it rejects his statute of limitations defense, but reverse and remand for a new trial on damages.
Five days after Dr. Beck operated to remove polyps from Richard Holloway’s sinuses, Mr. Holloway was diagnosed with *6 meningitis attributed to streptococcus pneumoniae. Dr. Beck told Mr. Holloway and his wife that microorganisms must have reached his meninges (membranes surrounding the brain) through “natural cracks” in his skull, openings which must have subsequently healed shut because he could see no evidence of continued leakage.
Some two years later, once again afflicted with meningitis, he was admitted to a different hospital. This time he was attended by Napoleon G. Bequer, who ordered radiological studies. Dr. Bequer concluded that Mr. Holloway had contracted meningitis on account of defects in the left cribriform plate and the right fovea ethmoidalis, holes which created pathways in his skull through which sinus infections could spread into the brain cavity. His protestations at trial notwithstanding, the jury was entitled to conclude that Dr. Beck’s negligence while operating was responsible for the intracranial connection, and the meningitis that ensued.
As a result of his initial bout with meningitis, Mr. Holloway left the hospital with disequilibrium, paralysis on the left side of his face, and hearing loss in his left ear. Fortunately, Mr. Holloway suffered no additional, permanent ill effects from the second episode of meningitis. Before discharging Mr. Holloway from the hospital, Dr. Bequer corrected the iatrogenic defects surgically.
I.
On July 6, 2001, Mr. Holloway and Kim Holloway, his wife, filed suit against Dr. Beck and Advanced Otolaryngology Services, P.A., on account of the surgery Dr. Beck had performed on June 18, 1997, and his handling of the case thereafter. Dr. Beck set up the statute of limitations as a defense, and moved for summary judgment on that basis. See § 95.11(4)(b), Fla. Stat. (1997) (requiring that an action for medical malpractice be brought “within 2 years from the time the incident is discovered, or should have been discovered with the exercise of due diligence”).
The trial court denied the motion for summary judgment, and submitted the Holloways’ claims to the jury, along with the question of their timeliness. See Tanner v. Hartog, 618 So.2d 177, 181 (Fla. 1993) (“We hold that the knowledge of the injury as referred to in the rule as triggering the statute of limitations means not only knowledge of the injury but also knowledge that there is a reasonable possibility that the injury was caused by medical malpractice.”) (footnote omitted). The Holloways had gone to a lawyer soon after Dr. Beck operated, because they suspected nasal packing deliberately left in place (not sponges inadvertently misplaced, as they first thought) had caused the meningitis. That lawyer and a physician the lawyer consulted concluded (correctly) that leaving the packing in place had not been negligent, and did not in any event account for the meningitis, and the Holloways were so advised. Not until August of 1999, when Dr. Bequer told them about the holes Dr. Beck’s surgical instruments had made, did the Holloways have a genuine basis to suspect negligence, an “awareness of the existence of medical malpractice,” Stephens v. Bay Med. Ctr., 691 So.2d 1136, 1138 (Fla. 1st DCA 1997), founded in reasonable possibility, or so the jury had a right to decide.[1]
*7 Dr. Beck never informed the Holloways that he made the holes in Mr. Holloway’s skull. He told them that the holes were a “ ‘natural’ or non-negligent” occurrence, and so testified at trial. Tanner, 618 So.2d at 185 (Kogan, J., concurring) (“Where plaintiffs have little or no special expertise and were told that the untoward event was ‘natural’ or non-negligent, then I can envision only a few extraordinary situations in which the statute will begin to run on the date of the event itself.”); see id. at 182 (majority opinion) (“[I]f the injury is such that it is likely to have occurred from natural causes, the statute will not begin to run until such time as there is reason to believe that medical malpractice may possibly have occurred.”); see also Stephens, 691 So.2d at 1138-39 (“[Wjhen confronted with the question of the plaintiffs awareness of the existence of medical malpractice, trial courts should inquire into the facts actually known to plaintiffs and the plaintiffs’ level of knowledge, education, and awareness of medical practice and what is likely to be considered a negligent act. In addition, courts must inquire into what the medical providers actually told the plaintiff about the event.”).
Accordingly, a genuine issue of material fact existed as to when the Holloways first had reason to know that Dr. Beck had negligently punctured Mr. Holloway’s skull, and the trial court properly denied Dr. Beck’s motion for summary judgment on this ground, allowing the question of when “the incident ... should have been discovered” to be determined by the jury. § 96.11(4)(b), Fla. Stat. (1997).
II.
The evidence of medical malpractice was more than sufficient. In addition, the jury found the malpractice caused damages in the amount of $2,500,983.00, and put Mr. Holloway’s lost earnings (past and future) at $762,000.00. A truck driver, Mr. Holloway testified at trial that he was no longer able to drive a truck, citing fatigue, memory loss, partial hearing loss, and an inability to bend over without falling down, all problems he attributed to his meningitis. But the jury was deprived of important information: Videotape taken in November of 2003 showed him loading and driving his eighteen-wheeler, and included footage of him bending over (without falling), kneeling, and turning and twisting while strapping down loads. Even though the defense had furnished the plaintiffs a copy of the videotape before trial, the trial judge excluded this highly relevant evidence.
The Holloways had made no discovery requests for surveillance videotapes (or any other photographs) when, four weeks before trial, Dr. Beck moved for leave to take their depositions a second time. The motion revealed that the defense had surveillance videotape in its possession; and offered to furnish the plaintiffs a copy of what it intended to offer at trial, but requested that the defense not be compelled to produce the videotape before the depositions. The trial court granted the motion, allowing additional depositions and permitting defense counsel to wait until after the depositions to provide the Hollo-ways a copy of the videotape.
Immediately after the depositions, defense counsel gave the Holloways a thirty-minute videotape of the surveillance footage Dr. Beck intended to use at trial. (The defense also listed “surveillance vid *8 eo” as an exhibit on the pretrial stipulation the parties filed.) Later that day the Hol-loways requested all surveillance footage, whether or not the plaintiffs intended to use the footage at trial. The following day defense counsel voluntarily furnished plaintiffs’ counsel all the footage defense counsel had: four unedited videotapes, two of which depicted Mr. Holloway, and two of which contained only “administrative time shots.”
Four days into trial, the Holloways moved to strike the “defendant’s surveillance video,” claiming that it had been disclosed too late and that blue screens between segments suggested that portions had been edited out. The court heard testimony regarding how the surveillance company received, copied and stored surveillance tapes. Robert Mirando, the defense investigator and videographer, then testified that blue screens appeared on the videotape each time he rewound the tape to review it, then ran it forward beyond the point he had left off videotaping. Mr. Mirando described the surveillance he had done of Mr. Holloway, established a chain of custody for his video camera and for the videotape, and testified that he had provided defense counsel with all of the footage he had taken of Mr. Holloway. Mr. Mir-ando’s testimony also revealed, for the first time, that another investigator had been assigned to do surveillance and had done some “administrative” videotaping,[2] which had not been provided to counsel.
The second videographer’s footage contained nothing, however, but “administrative time shots,” street scenes he had filmed to prove that he was at a particular location at a particular time (so that he could get paid).[3] After this evidentiary showing, defense counsel argued that the additional footage was altogether irrelevant because it contained only “administrative time shots” and not a single image of Mr. Holloway. The trial court initially reserved ruling on the motion to strike to allow counsel the weekend to ascertain whether any more videotape existed.
Over the weekend, defense counsel offered the Holloways’ counsel an opportunity to view all of the original tapes, but the offer was declined. After the weekend recess, defense counsel informed the court that there were five original, unedited videotapes, and that copies of four of them had already been provided to the Hollo-ways. The fifth, a copy of which defense counsel had delivered to the Holloways’ counsel over the weekend, contained approximately two minutes of “administrative time shots” and nothing more.
Counsel for the Holloways argued that no videotape should be allowed in evidence because they had not received the fifth original, unedited videotape before trial. In response, Dr. Beck’s counsel first asked the trial court to view the videotapes before ruling on the plaintiffs’ motion to strike. Refusing this request, the trial court ruled that the jury could not see any of the videotapes: The trial court granted the Holloways’ motion to strike the surveillance videotape, holding that the Hollo-ways had been entitled to see all of the original tapes before trial, including the fifth videotape with its two minutes of “administrative time shots.”
This was error. At no time had there ever been a formal discovery request to *9 view any of the tapes. Compare Dodson v. Persell, 390 So.2d 704, 707 (Fla.1980) (“[UJpon request a party must reveal the existence of any surveillance information he possesses whether or not it is intended to be presented at trial.”) (emphasis supplied); id. at 708 (“[T]he seeking party must be afforded a reasonable opportunity to view the surveillance information before trial.”) (emphasis supplied).
With no showing — indeed, no possibility — of prejudice to the Holloways from the second videographer’s “administrative time shots,” there was no justification for excluding surveillance videotape the plaintiffs got a copy of the day they were deposed. See Med. Logistics, Inc. v. Marchines, 911 So.2d 823, 824 (Fla. 1st DCA 2005) (citing three factors prescribed in Linger v. King Pest Control, 401 So.2d 1310 (Fla.1981), and explaining that “a judge should not exclude the evidence if consideration of these and other relevant factors reveals that use of the evidence would not substantially endanger the fairness of the proceeding”). The videotape the defense sought to introduce in evidence had been fully disclosed, and was listed as an exhibit. Compare La Villarena, Inc. v. Acosta, 597 So.2d 336, 338 (Fla. 3d DCA 1992) (holding court may exclude use of video that was not listed as an exhibit, where opposing party was not afforded a reasonable opportunity to counter the evidence). Neither party had any intention or reason to show the jury the fifth unedited videotape containing the second videographer’s “administrative time shots.”
It was improper, moreover, for the trial court to rule, without first examining the contents of the fifth original, unedited videotape, at least. See Med. Logistics, Inc., 911 So.2d at 824 (holding “exclusion of [surveillance video] evidence is a drastic remedy which should pertain in only the most compelling circumstances and only after the judge has made a case-specific determination as to whether admission of the evidence would result in actual procedural prejudice to the objecting party”). The Holloways have never challenged the defense’s assertion that the second videog-rapher’s “administrative time shots” were the only thing on the fifth original, unedited videotape.
As a fallback position, the Hollo-ways argue that excluding the surveillance videotape was harmless error because the investigator was permitted to testify he saw Mr. Holloway loading and driving a truck. But the plaintiffs mounted a sustained and vigorous attack on the investigator’s credibility. It cannot be said that excluding the surveillance videotape, which would have corroborated the investigator’s account of what he witnessed while shooting the footage, was unlikely to have affected the outcome of the trial. Because the error went only to the extent of the Holloways’ damages, however, and not to whether Dr. Beck had committed medical malpractice, we remand for a new trial on damages only, with directions that the surveillance videotape be allowed in evidence.
Reversed and remanded, with directions.
ERVIN and DAVIS, JJ., concur.

. Dr. Beck also contends that the trial court erred in denying his motion to bifurcate the trial and try the statute of limitations question first by itself. While Florida Rule of Civil Procedure 1.270(b) provides that a court, "in furtherance of convenience or to avoid prejudiced] may order a separate trial of any claim ... or ... issue,” separate proceedings are not required simply because there is a statute of limitations issue for the jury to determine. *7 See Fla. Std. Jury Instr. (Civ.), Verdict Form 8.9. We also reject Dr. Beck’s contention that plaintiffs’ counsel’s closing argument entitles him to a new trial on the limitations defense, or that the exclusion of what proved to be cumulative evidence had any likely effect on the outcome.

. Although the second videographer attempted additional surveillance in January of 2004, Mr. Holloway had sold his truck by then, and the efforts at additional surveillance proved unavailing. The second videographer was not listed or called as a witness. See Huet v. Tramp, 912 So.2d 336, 338 (Fla. 5th DCA 2005) (holding videotape shot by videogra-pher not called as a witness is work product and is not subject to discovery).

. None of the “administrative time shots” depicted Mr. Holloway.